[Crim. No. 3460. Second Dist., Div. One. Jan. 6, 1942.]

THE PEOPLE, Respondent, v. RUSSELL L. BROPHY, Appellant.

16

Charles H. Carr for Appellant.

Earl Warren, Attorney General, and Warren Olney and Herbert E. Wenig, Deputies Attorney General, for Respondent.

WHITE, J.—In an indictment returned by the grand jury of Los Angeles County, defendant was accused in two counts of the crime of perjury. Following pleas of not guilty, a trial by jury resulted in the conviction of defendant on both counts. From such judgment of conviction and from the order denying his motion for a new trial this appeal is prosecuted.

The factual background upon which this prosecution was based may be thus summarized: Leonard J. Nevans and defendant, Russell L. Brophy, as individuals, were doing business in the city of Los Angeles under the fictitious firm name and style of Los Angeles Journalist Publishing Company. On or about November 6, 1939, defendant's firm entered into a contract with Southern California Telephone Company, a corporation, hereinafter referred to as the telephone company, under the terms of which agreement the telephone company agreed to furnish and did furnish to Nevans and Brophy at their place of business a telephone connection and service, consisting of ten No. 51 order tables, one hundred trunk lines and four business trunk lines. Nevans and Brophy paid to the telephone company all installation costs as well as all charges for telephone service rendered by the telephone company.

On December 18, 1939, the Honorable Earl Warren, in his capacity as Attorney General of the State of California, addressed a letter to the telephone company reading as follows:

"Mr. N. R. Powley, President

"Pacific Telephone and Telegraph Company

"140 New Montgomery Street

"San Francisco, California

"Dear Sir:

"On November 30, 1939, a letter was addressed to you in which I called your attention to a law enforcement problem

which affects practically every community in California, and with which the peace officers are struggling at the present time. This letter was directed to the particular problem of the furnishing of information to book-making establishments through the use of telephonic and telegraphic equipment by Normile and Brophy for Southern California, and Kreling and Cohen for Northern California, whereby bookmakers throughout the state could carry on their illegal activities.

"At that time I requested your cooperation and the immediate discontinuance of telephone service to these individuals on the grounds that it aided, abetted, and encouraged the perpetration of unlawful acts, to wit, violation of section 337a of the Penal Code. I also pointed out to you section 638 of the Penal Code which section clearly authorized the immediate cancellation of any contracts that may have been in force with these individuals and which would further authorize communication companies to decline to enter into contracts for similar service.

"Through your good offices the Kreling and Cohen service was canceled and it was announced that Normile and Brophy had abandoned their service. I, however, now find that it is necessary for me to again call upon you to cancel the service of Russell L. Brophy and Leon J. Nevins, both of them having been previously connected with the Nationwide News Service, who are still furnishing information to bookmaking establishments throughout the state through the use of telephonic equipment furnished by your company. These individuals are operating from 650 South Spring Street, Los Angeles, California, and I have in my possession definite evidence, which has been substantiated, that will prove that such illegal activities are being carried on by these individuals.

"It is therefore requested that you immediately cancel the service of Russell L. Brophy and Leon J. Nevins.

"Sincerely yours.
"Earl Warren,
"Attorney General."

Thereupon the telephone company addressed a communication to Leonard J. Nevans, reading as follows:

"Dear Sir:
"Mr. Earl Warren, Attorney General of the State of California, has written a letter dated December 18, 1939, requesting us immediately to discontinue telephone service to you

on the ground that such service aids, abets, and encourages the perpetration of unlawful acts committed by you; to-wit, violations of section 337a of the Penal Code of the State of California. In accordance with the request of the Attorney General, we therefore give you this notice that the service enumerated in the list attached hereto will be discontinued at the close of business on December 23, 1939.

"Yours very truly,

"F. N. Rush,

"Vice President and General Manager."

Following the receipt of this letter, to-wit, on December 23, a complaint for injunction against the telephone company was filed on behalf of defendant and Leonard J. Nevans, such complaint being signed and verified by the latter. This complaint alleged the application by plaintiffs in the injunction action to the telephone company for the installation of service as aforesaid; acceptance by the telephone company of such application; installation of the requested service; payment by plaintiffs of all deposits and service charges as required by the telephone company; and the complaint contained the further averment that plaintiffs had complied with the rules and regulations of the telephone company, and further set forth plaintiffs' protest against the threatened discontinuance of telephone service and the fact that such protests were unavailing; that the contemplated action of the telephone company to remove their telephone service was unwarranted, discriminatory, and would result in serious and irreparable damage to the plaintiffs and their business, which was alleged to be that of publishing and printing daily publications giving the news of prospective horse races, such as the names of horses, their positions, jockeys, scratches, and probable odds. The complaint for injunction further alleged that the telephone service was used to disseminate free racing information on incoming calls made over such telephones by the readers of and subscribers to plaintiffs' publication.

On the day of the filing of said complaint for injunction the superior court issued its order to show cause and temporary restraining order against the telephone company, by and through which the latter was restrained from discontinuing plaintiffs' telephone service pending hearing on the order to show cause.

■ On January 2, 1940, the city of Los Angeles, a municipal corporation, filed a complaint in intervention in the injunction proceeding, alleging as grounds for intervention that the city had an interest in the litigation, in that the police department of such city had the duty to enforce the laws of the State of California within the corporate limits of such city; that the defendant telephone company, in furnishing service to plaintiffs, used the streets of the city by virtue of the authority of franchises; that the Attorney General had asked the mayor to cause the city to intervene; that the use of the telephone service would aid and assist in violation of penal statutes of California, and in particular section 337a of the Penal Code; that the plaintiffs' business was unlawful; that the law enforcement agencies of California were real parties in interest in the action, in that the effect of a judgment restraining the telephone company from discontinuing service to plaintiffs would tend to establish the legality of plaintiffs' business and would prevent law enforcement agencies from effectively preventing violations of section 337a of the Penal Code. The city's complaint in intervention further alleged that the business conducted by plaintiffs was unlawful, in that the latter published so-called scratch sheets which disclosed information concerning horse races to be run on various tracks throughout the United States; that such scratch sheets were published by plaintiffs primarily as an aid to gambling operations, and that the plaintiffs rendered aid and assistance to persons engaged in violations of bookmaking laws.

■ On January 4, 1940, the Attorney General of the State of California filed a complaint in intervention on behalf of the state. This complaint alleged that the State of California had an interest in the matter in litigation because the granting of the injunction to plaintiffs would enable them to aid and assist in the violation of gambling laws and contribute to the maintenance of public nuisances; that plaintiffs would use the telephone facilities to distribute horse-racing information to persons who would by the use of such information violate the gambling laws of this state, and that such persons would be enabled to maintain bookmaking establishments; that the granting of the injunction would compel the telephone company to aid and abet bookmaking and contribute to the maintenance of public nuisances.

The telephone company filed an answer in the injunction

case on January 4, 1940, which pleading consisted of a general denial and one separate and affirmative defense based entirely upon the letter from the office of the Attorney General hereinbefore quoted.

On January 9, 1940, plaintiffs in the injunction action filed demurrers to the answer of the telephone company and to the complaints in intervention interposed by the city and the state. On the same date there were filed motions to strike the complaints in intervention proffered by the city and the state and also to strike portions of the answer of the telephone company, as well as motions to vacate the orders granting permission to the state and city to intervene. The superior court denied the motions to vacate the orders granting leave to intervene and also the motion to strike portions of the answer of the telephone company, and overruled demurrers to the complaints in intervention and the answer of the telephone company. At the hearing on the order to show cause the temporary restraining order was dissolved, and on January 11, 1940, plaintiffs filed a dismissal of the action, and the proceedings in the injunction litigation were thereupon terminated.

Count 1 of the indictment is predicated upon an affidavit sworn to by defendant herein, Russell L. Brophy, and filed by him on January 2, 1940, in the injunction action, while the same was pending before the superior court. That portion of the affidavit which is alleged to be perjurious in count 1 of the indictment reads: "Affiant further states that the plaintiffs have no arrangements whatsoever with any wagering establishments or persons engaged in the business of accepting wagers whereby the plaintiffs supply any turf news as aforesaid whatsoever by telephoning to any such establishments or persons."

Count 2 of the indictment is based upon an affidavit sworn to by defendant and filed by him in the injunction action on January 6, 1940. The portions of the affidavit alleged in count 2 of the indictment to be false and contrary to the oath taken by said Russell L. Brophy read as follows:

"Affiant states that they have not given out to any readers or distributors secret telephone numbers for use by them in making calls to plaintiffs' place of business. Affiant further states that the plaintiffs do not keep their telephone numbers secret. Affiant states that plaintiffs have not to his knowledge ever given any telephone numbers to any 'pool

sellers' and 'bookmakers.' That it is not the purpose of the plaintiffs, nor do they use the said telephone lines installed by the defendants, for the dissemination of 'rapid, up to the minute horse racing information including the names of horses, positions, jockeys and betting odds,' knowingly to any 'bookmaker' or 'pool seller.' Affiant further states that at no time do they ever give any information to any person calling concerning up to the minute betting odds or any betting odds. That the only information given to readers are opinions as to probable odds, as formulated by the so-called handicappers of the continental press or the plaintiffs' handicapper.

"Affiant further states that no information is given by plaintiffs to its readers concerning track odds prior to the running of a race nor any news whatsoever concerning the running of a race until such race has been run and the results thereof have become public news.

"Nor was this affiant ever financially interested at any time in any so-called Annenberg Enterprises, or in their employ.

"Affiant further states that the plaintiffs do not have regular subscribers who are given numbers different than Vandyke 8172."

Appellant first assails the judgment on the ground that the matter constituting the assignments of perjury in both counts 1 and 2 was not material to any issue in the suit for injunction. In defining a material allegation, section 463 of the Code of Civil Procedure provides: "A material allegation in a pleading is one essential to the claim or defense, and which could not be stricken from the pleading without leaving it insufficient." Section 1867 of the Code of Civil Procedure provides that none but a material allegation need be proved.

It is axiomatic that perjury can be predicated upon the giving of false testimony only when such testimony is material to the issues presented in the cause in which the alleged false testimony is given. ██ Ordinarily it may be said that the testimony is material when it could have properly influenced the trial judge before whom the case was being tried upon the material issue or issues involved therein; and it cannot be questioned that the materiality of the testimony for the giving of which perjury is charged is within the right of the trial judge in the criminal case to decide in the first instance, and for this court to decide on appeal. In fact,

the question of the materiality of evidence, whenever or however it arises, is one for the court. (*People* v. *Curtis*, 36 Cal. App. (2d) 306, 319 [98 Pac. (2d) 228]; *People* v. *Macken*, 32 Cal. App. (2d) 31, 41 [89 Pac. (2d) 173]; *People* v. *Bradbury*, 155 Cal. 808 [103 Pac. 215].) Section 118 of the Penal Code, under which appellant was convicted, reads: "Every person who, having taken an oath that he will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states as true any material matter which he knows to be false, is guilty of perjury." In the case of *People* v. *McDermott*, 8 Cal. 288, the court said: "The rule is well established, that the false oath must be material to the issue, and, therefore, prejudicial to some one, otherwise, however willful, it cannot be perjury." It is equally well established that the issue must be valid and not false or fictitious.

In arriving at a conclusion as to the materiality of the portions of appellant's affidavit in the injunction suit which are assigned as perjury, and to the validity of the issues as well, we must give consideration to the nature and purpose of the litigation in which such affidavits were filed. The record reveals that appellant's complaint for injunction against the telephone company was nothing more than an action to enforce his alleged rights under a simple contract by the terms of which appellant had agreed to pay for and the telephone company had agreed to furnish and was furnishing telephone service in the form of one hundred telephone lines.

Defendant telephone company's answer, in addition to express denials, some on information and belief, purported to allege an affirmative defense based on the letter received by the company from the Attorney General. In that connection, the company's answer alleges that on or about December 18, 1939, Mr. N. R. Powley, president of defendant company, received a letter from the Attorney General of the State of California stating that Russell L. Brophy and Leonard J. Nevans were furnishing information to bookmakers through the use of telephonic equipment furnished by defendant company and that said letter concluded with a request that the telephone service rendered to said Brophy and Nevans immediately be cancelled. The affirmative defense further alleged that following the receipt of said letter from the Attorney General, the defendant made inquiry of said Attorney Gen-

eral and his deputies and assistants as to the nature of the evidence of and against the said Brophy and Nevans referred to in said letter of the Attorney General; that "the Attorney General and his assistants and deputies informed the defendant that law enforcement officers had been present at bookmaking establishments in the County of Los Angeles and had observed that information which was used for the purpose of and in connection with the placing of wagers upon the results of horse races was being received at said establishments over telephone equipment installed therein; that the said law enforcement officers had investigated the source of the information thus received, and had found that it emanated from room 917, 650 South Spring Street, Los Angeles, California, and was transmitted from said source by means of telephone communication to said bookmaking establishments."

The affirmative defense concludes with the allegation that the company then sent the letter hereinbefore set forth in full, to wit, the letter from the company to Nevans under date of December 20, 1939, informing plaintiff of the company's intention to discontinue service at the close of business on December 23, 1939.

It is especially important to note and also to emphasize that the answer contains no allegations of fact whatsoever purporting to set up a defense under and by virtue of section 638 of the Penal Code, which section was referred to in the letter of the Attorney General as above noted. But the reason for the failure of defendant company to urge such a defense is obvious from an examination of said section, which section clearly affords no grounds for the action of the company nor for the statement of the Attorney General as contained in his letter of December 18. That section refers only to the refusal to send or deliver *messages received for transmission*, and the willful refusal or neglect to do so is made a misdemeanor, unless such *message* is calculated to instigate or encourage the perpetration of any unlawful act. It is not even remotely applicable to the situation presented in the civil action nor to the subject matter of the Attorney General's letter.

By reason of the pleadings and the law as above outlined, it becomes necessary to determine whether the telephone company was bound to follow and obey the order of the Attorney General, for although literally in the form of a request, nevertheless, in the light of the substance and form

thereof, such request was but an order in polite terms. And that it was so interpreted by the telephone company there can be no question, for manifestly, unless so interpreted, it would have been considered presumptuous and accordingly ignored. If the company was bound as a matter of law to obey the order of the Attorney General, then the affirmative defense as above set forth would have been valid; if not, its invalidity is obvious. In order to determine that question, it becomes necessary to consider the powers and duties of the office of the Attorney General. Those powers and duties are now derived from section 21 of article V of the Constitution of California, which section was adopted by the people of the state as an initiative measure on November 6, 1934. Formerly the Constitution was silent upon this subject, and such powers and duties were set forth only in section 470 of the Political Code. The powers and duties now set forth in the constitutional provision are largely the same as those set forth in section 470 of the Political Code.

Section 21 of article V of the Constitution reads in part as follows:

"Subject to the powers and duties of the Governor vested in him by Article V of the Constitution, the Attorney General shall be the chief law officer of the State and it shall be his duty to see that the laws of the State of California are uniformly and adequately enforced in every county of the State. He shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make to him such written reports concerning the investigation, detection, prosecution and punishment of crime in their respective jurisdictions as to him may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases he shall have all the powers of a district attorney. When required by the public interest, or directed by the Governor, he shall assist any district attorney in the discharge of his duties. . . .

"He shall also have such powers and perform such duties as are or may be prescribed by law and which are not inconsistent herewith. . . ."

 As will be seen from an examination of the above section of the Constitution, the powers of the Attorney General are not without limitation. Manifestly, ''direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law'' does not contemplate absolute control and direction of such officials. Especially is this true as to sheriffs and district attorneys, as the provision plainly indicates. These officials are public officers, as distinguished from mere employees, with public duties delegated and entrusted to them, as agents, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which they, as agents, are active. (*Coulter* v. *Pool*, 187 Cal. 181 [201 Pac. 120].) Moreover, sheriffs and district attorneys are officers created by the Constitution. In that connection it should be noted that there is nothing in section 21 of article V that indicates any intention to depart from the general scheme of state government by counties and cities and counties, as well as local authority in cities, as provided by sections 7½, 7½a, 8 and 8½, of article XI. By interpreting section 21 of article V in the light of the above-mentioned provisions, it is at once evident that ''supervision'' does not contemplate control, and that sheriffs and district attorneys cannot avoid or evade the duties and responsibilities of their respective offices by permitting a substitution of judgment. The sole exception appears to be that whenever ''in the opinion of the Attorney General any law of the state is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute,'' in which cases ''he shall have all the powers of a district attorney.'' But even this provision affords no excuse for a district attorney or a sheriff to yield the general control of his office and duties to the Attorney General.

 If the powers of the Attorney General are thus limited in the most direct performance of the duties of that office, by what authority may that official invade the affairs of other governmental agencies in general and public utility companies in particular? If there is any such authority at all, it must be by virtue of the first sentence of section 21, which as above noted reads as follows: ''The Attorney General shall be the chief law officer of the state and it shall be his duty to see that the laws of the State of California are uniformly and adequately enforced in every county of the

state.'' Manifestly, enforcement of the laws contemplates enforcement according to law, the procedure for which is definitely established. There is nothing in section 21 of article V which authorizes the Attorney General to depart from that procedure; and in that connection, no provision has been called to our attention, nor have we been able to find any, which directly or indirectly empowers the Attorney General to issue any orders in the nature of those contained in the letter to the telephone company. The expression, ''the Attorney General shall be the chief law officer,'' as provided in section 21 of article V, obviously confers no such authority, for at most such an expression, interpreted in the light of the limitations that follow, can be no more than descriptive, and vests no more authority in the Attorney General than the expression in section 1 of article V, viz., ''The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled the governor,'' vests in the governor.

It is evident from the foregoing that the law vests no authority in the office of the Attorney General to order a telephone company to discontinue its service, and this being true, the telephone company was not bound to abide by the order of the Attorney General, as was done in the circumstances disclosed by the record herein.

If there can be any question as to the above conclusion it is at once removed by a consideration of another phase of the situation, which definitely fixes the exclusive authority over public utility companies in the railroad commission. The people of California, through the adoption of section 23 of article XII of the Constitution, have seen fit to repose such power to supervise and regulate public utilities, which include telephone companies, solely and alone in the railroad commission, which governmental agency is clothed with such power of supervision and regulation as the legislature may confer upon it. As declared by the cited constitutional section, ''the right of the legislature to confer powers upon the railroad commission respecting public utilities *is hereby declared to be plenary and to be unlimited by any provision of this Constitution.*'' (Italics added.) Pursuant to the grant of such power by the Constitution, the legislature adopted what is commonly referred to as the Public Utilities Act (Stats. 1915, p. 115 and amendments thereto; 2 Deering's Gen. Laws, Act 6386), section 30 of which provides: ''Every public utility shall obey and comply with each and every re-

quirement of every order, decision, direction, rule or regulation made or prescribed by the commission in the matters herein specified, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper in order to secure compliance with and observance of every such order, decision, direction, rule or regulation by all of its officers, agents and employees.''

In the exercise of its powers under the Constitution and the Public Utilities Act, the railroad commission has promulgated rule and regulation No. 11, governing the right and power of Southern California Telephone Company at Los Angeles to discontinue service. (Railroad Commission Revised Sheet No. 34263-T, canceling Revised Sheet No. 7986-T.) The rule in question reads in part as follows: ''D. Legal Requirements: The Company may refuse to establish service for an applicant or it may discontinue and disconnect service to a subscriber, whenever the use made or to be made of the service, or the furnishing of service to the premises of the applicant or subscriber, is prohibited under any law, ordinance, regulation, or other legal requirement.''

It inevitably follows from the foregoing that the so-called affirmative defense was invalid and therefore raised no issues. In both substance and effect it amounted to no more than a recital of certain information that respondent telephone company had received, and the source thereof added nothing to its value as a defense.

The law is clear and decisive on the question of the enforceability of a contract even though one of the parties thereto has knowledge of an intended purpose of the other party, by means of the contract, or the performance thereof, to violate some law or public policy of the state. The rule in that regard is thus stated in 53 A. L. R. 1364 at page 1366:

''The rule, according to the great weight of authority, is to the effect that a contract legal in itself is not rendered unenforceable by the mere fact that one of the parties thereto has knowledge of an intended purpose of the other party thereto, by means of the contract or subject-matter thereof, to violate some law or public policy of some state; or, as is stated in 6 R. C. L. p. 696, 'where there is no moral turpitude in the making or in the performing of the contract, the mere fact that an agreement the consideration and performance of which are lawful incidentally assists one in evading a law or public policy, is no bar to its enforcement,

and that, if the contract has been performed by the promisee, it is no defense that the promisor knew that the agreement or its performance might aid the promisee to violate the law or to defy the public policy of the state, when the promisor neither combined nor conspired with the promisee to accomplish that result, nor shared in the benefits of such a violation.' ''

The rule just quoted has been followed by the courts of this state in *California Raisin Growers Assoc.* v. *Abbott,* 160 Cal. 601 [117 Pac. 767], where it was held that the vendor of goods may recover the purchase price even though he knew that such goods were bought for an illegal purpose, provided such illegal purpose is not made a part of the contract. In the case of *Gallick* v. *Castiglione,* 2 Cal. App. (2d) 716 [38 Pac. (2d) 858], it was held that knowledge on the part of the seller of sugar that the purpose of the purchaser thereof was to illegally manufacture whiskey, was no defense to an action for the purchase price where the illegal purpose was not a part of the contract. Without doubt, therefore, the telephone company in the injunction case could have enforced its contract against appellant notwithstanding the letter written by the Attorney General, because no claimed illegal purpose was part of the contract itself. No citation of authority is necessary for the statement that if the contract was enforceable by one of the parties thereto it was equally enforceable by the other. Furthermore, in the instant case it is not claimed that appellant himself was violating the law, but that he was by means of the telephone supplying news and information to third persons who were violating the law. If it be the law that a contract is rendered unenforceable because one of the parties thereto, in the performance of his part of the contract, makes is possible for a third party to violate the law, there would be a rarity of enforceable contracts. A newspaper, for instance, would be unable to enforce its contract with a news service because, forsooth, it was printing news concerning horse races and selling its newspapers to people who used news contained therein for gambling purposes in violation of the law. Also, if the theory just mentioned be correct, courts of equity would be compelled to abandon their long-established doctrine that such courts will not undertake to enforce the criminal law and will not enjoin the commission of a threatened act merely because the act would be a crime. (*Weis* v. *Superior Court,* 30 Cal.

App. 730, 732 [159 Pac. 464].) ▮▮ It is only where the threatened acts will constitute a public nuisance, as that term is defined by our statutes, that a court of equity is vested with jurisdiction to interpose its injunctive processes to prevent injury which will result from the maintenance thereof. ▮▮ Threatened crimes may not be enjoined as such, but the acts out of which they grow must come within the definition of a public nuisance before a court of equity will intervene.

Section 3369 of the Civil Code provides: ''Neither specific nor preventive relief can be granted to enforce a penal law, except in the case of a nuisance.'' The rule laid down in the quoted code section applies where the acts complained of constitute merely a crime or series of crimes. (*People* v. *Seccombe*, 103 Cal. App. 306, 314 [284 Pac. 725].)

That the dissemination of racing news to bookmakers does not *per se* constitute a nuisance was emphatically declared by our Supreme Court in *Kreling* v. *Superior Court*, 18 Cal. (2d) 884 [118 Pac. (2d) 470]. It is significant and noteworthy that the acts charged against petitioner Kreling in the case just referred to were identical with the acts charged against appellant by the Attorney General's office in the injunction proceeding against the telephone company and as contained in the letter of that state officer to the telephone company hereinbefore noted, *viz.*, the dissemination of and furnishing of services and supplies necessary to the functioning of bookmaking establishments; but it was held by the Supreme Court that such facts did not warrant the conclusion that the acts of petitioner in the Kreling case constituted a public nuisance within the terms of our statute. It was there held that facts must be alleged from which it can be determined that the furnishing of such supplies or information are activities which are injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property. (Civ. Code, secs. 3479, 3480; *People* v. *Lim*, 18 Cal. (2d) 872 [118 Pac. (2d) 472].) In the Kreling case, *supra*, the court said: ''In the absence of such allegations the court had no adequate basis for the issuance of its restraining order which, in broad terms, enjoined petitioners from printing or distributing racing forms and scratch sheets, from gathering or disseminating horse racing news and from using their printing plants *or communication facilities* for such purposes.'' (Italics added.)

Respondent's claim that the furnishing of racing news to bookmaking establishments by telephone constitutes an aiding and abetting in a violation of section 337a of the Penal Code is without merit. It is not the transmission by use of a telephone of information concerning the results or probable results of horse races that·constitutes a violation of the quoted Penal Code section, but it is the use which persons may make of such information in the acceptance of bets or maintaining places for the reception of bets that constitutes a violation of the law. Neither the telephone company nor appellant in his capacity of a subscriber for telephone service was accused in the injunction suit of managing, operating or participating in any gambling place or enterprise maintained for the acceptance of wagers on horse races or other contests of skill between men or beasts; and the most that can be said of the charges made against the telephone company and appellant is that the telephone company placed in the hands of appellant the means of furnishing information to others locally and at distant points, which information might be used by such persons to contravene the provisions of section 337a of the Penal Code.

Public utilities and common carriers are not the censors of public or private morals, nor are they authorized or required to investigate or regulate the public or private conduct of those who seek service at their hands. Simply because persons who received information transmitted over the telephone facilities were enabled as a result of such information, if they were so inclined, to commit unlawful acts, does not make the telephone company a violator of the criminal laws. If such were the case, the telephone company would likewise be guilty in permitting its facilities to be used in transmitting information to the newspapers of the country as to prospective horse races or prize fights, because the information thus transmitted and published induced or enabled persons to engage unlawfully in betting on the results of such contests. The telephone company has no more right to refuse its facilities to persons because of a belief that such persons will use such service to transmit information that may enable recipients thereof to violate the law than a railroad company would have to refuse to carry persons on its trains because those in charge of the train believed that the purpose of the persons so transported in going to a certain point was to commit an offense, or because the officers of such company

were aware of the fact that the passengers were intent upon visiting a bookmaking establishment upon arrival at their destination, which establishment was maintained for the purpose of unlawfully receiving bets on horse races. ▮ Furthermore, the furnishing or receiving of racing or sporting information is not gambling and is not a crime. (*In re Teletype Machine No. 33335,* 126 Pa. Super. 533 [191 Atl. 210, 213].) For well considered and ably reasoned cases supporting the foregoing views, see *Commonwealth* v. *Western Union Tel. Co.,* 112 Ky. 355 [67 S. W. 59, 99 Am. St. Rep. 299, 57 L. R. A. 614], and *State* v. *Shaw,* 39 Minn. 153 [39 N. W. 305].)

The statements of appellant upon which all the assignments of perjury in count 2 are based were set up to meet allegations in the complaint in intervention filed by the state that appellant was disseminating racing news by use of his telephone lines. While, as we have pointed out elsewhere, the averments of appellant contained in his affidavits upon which the perjury charges were based were immaterial, it is also true that in connection with count 2 they were offered in response to allegations set forth in a pleading which had no validity. ▮ Neither complaint in intervention states facts sufficient to constitute a cause of action for or ground of intervention. Section 387 of the Code of Civil Procedure authorizes the intervention before trial of any person "who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both." ▮ The burden rests upon the one seeking to intervene to show that his is a proper case for intervention. (20 Cal. Jur. 523.) When an intervener is admitted, the pleading which he presents and files must state facts sufficient, if true, to establish the right or interest which he claims, or else he has no longer a standing in court as a litigant if proper objection is made. (*Moran* v. *Bonynge,* 157 Cal. 295 [107 Pac. 312].)

▮ And the interest which entitles a party to intervene must be an interest in the matter in litigation in the suit *as originally* brought, and of such a present, direct and immediate character that the intervener will either gain or lose by the direct effect of the judgment. (*Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal. (2d) 661 [91 Pac. (2d) 599]; *La Mesa Lemon Grove & Spring Valley Irr. Dist.* v. *Halley,* 195 Cal. 739 [235 Pac. 999]; *McNeil* v. *Morgan,* 157 Cal. 373 [108 Pac. 69].) ▮ An intervener cannot be permitted to broaden

the scope or function of such special proceeding by urging claims or contentions which have their proper forum elsewhere. (*Wright* v. *Jordan,* 192 Cal. 704 [221 Pac. 915].)

██ ██ It is difficult to comprehend or understand what interest the state or city had in the injunction proceeding that was of such a direct or immediate character that either intervener would gain or lose by the immediate operation or effect of a judgment either for or against the telephone company. A judgment restraining the telephone company from discontinuing the telephone service would in no way affect the enforcement of the criminal laws regarding bookmaking by either state or city authorities. As we have pointed out, neither appellant nor the telephone company could be classed as aiders or abettors in violation of section 337a of the Penal Code, and the sole issue was the right of a subscriber for telephone service to compel a public utility to furnish service when its requirements for furnishing such service were met by the applicant therefor. If the offices of the Attorney General or the city attorney desired to aid the telephone company in its defense, they could have offered their aid to the court as amici curiae.

The sole claim of the interveners was that by discontinuance of the appellant's telephone service the duties of law enforcement would be materially lessened. Such an interest, however, to say the least, is indirect and inconsequential, as well as entirely remote. To hold that the Attorney General may intervene on behalf of the state in a lawsuit and the city attorney do likewise on behalf of the city simply because they believe that by the prevention of the performance of a contract between private litigants the burdens of their respective offices in the prosecution of violators of the law would be lessened, would lead to absurd results. Under such a holding it is not difficult to understand how, if a metropolitan Los Angeles newspaper brought suit against the Associated Press to restrain the latter from discontinuing its news service to the former under a contract providing therefor, the Attorney General or city attorney would have the right to intervene in such a lawsuit and insist that the Associated Press should be relieved of its contractual obligations because readers of the local newspaper utilized certain information contained in the Associated Press dispatches concerning horse races to accept and record bets upon such horse races, thereby violating section 337a of the Penal Code.

And all this notwithstanding the fact that the office of the Attorney General could not, on behalf of the state, nor the city attorney, on behalf of the municipality, successfully prosecute a suit for injunction against the local newspaper to restrain it from disseminating such racing news simply because such information might be used to effectuate a violation of the criminal laws.

There can be no question, therefore, that plaintiffs' motion in the injunction action to vacate the orders permitting the city of Los Angeles and the State of California to intervene should have been granted. This being true, no valid issues were raised by the pleadings in intervention, and hence any issues sought to be raised thereby were false. As heretofore noted, perjury cannot be predicated on a false issue. There remained then properly for the court's consideration in the injunction action only plaintiffs' complaint and the defendant telephone company's answer, as the sole valid issue raised by these pleadings. The issue was simple, and from what we have herein stated it follows that the allegations made by appellant in his complaint for injunction, as well as the averments in his affidavits upon which both counts of perjury contained in the indictment were based, were wholly unnecessary, superfluous and immaterial, and the trial court in the injunction litigation could not therefore have been properly influenced thereby in the determination of any material issue raised by the pleadings in the injunction case. Before a charge of perjury could be made out against appellant it was necessary that the alleged false statements contained in the indictment had been given in a judicial proceeding and that the same were material to a valid issue made therein. In this requirement the indictment was deficient.

None of the matters assigned as perjury in either counts 1 or 2 of the indictment, because of their immateriality to the issues framed by the pleadings in the injunction suit, could have properly influenced the court in determining the sole issue in such litigation, as to whether or not the telephone company should be restrained from discontinuing the service contracted for by appellant. If the contrary were the law, then the telephone company would be bound to investigate every application for use of its facilities to determine the purpose for which such service was going to be used. The only cause of action which could possibly result from the

material facts stated in the legally filed pleadings was, as heretofore stated in this opinion, a cause of action based on contract. The fact that attorneys for the plaintiff in the action against the telephone company deemed it advisable to file affidavits for the purpose of denying the hearsay alleged in the affirmative defense of the telephone company, is no reason for holding the averments of such affidavits material. They could not rightfully influence the court in passing upon the contractual relation, and that was the only valid issue presented. The fact that the action was one in equity does not alter this situation. The court was bound to follow the law. The equitable relief sought in the action was merely ancillary and served only to hold the contractual relationship between the parties *in statu quo* until the legal aspects of the litigation had been determined.

In view of the foregoing conclusion arrived at by us, it becomes unnecessary to consider the numerous other issues of importance raised by this appeal.

For the reasons herein stated, the judgments and the order denying defendant's motion for a new trial are, and each of them is, reversed, and the cause remanded with directions to the court below to dismiss the indictment.

Doran, J., concurred.

YORK, P. J., dissenting.—I dissent. I cannot agree with the foregoing opinion because of the fact that the false statements sworn to, and referred to in said opinion, were made for the purpose of influencing the court in an application made to it for equitable relief. Appellant makes numerous specifications of error occurring in the trial of the cause, but after an examination of the entire record, including the evidence, I am unable to say that the errors complained of resulted in a miscarriage of justice. (Sec. 4½, art. VI, Const. of Cal.)

A petition for a rehearing was denied January 20, 1942. York, P. J., voted for a rehearing.

Respondent's petition for a hearing by the Supreme Court was denied February 5, 1942. Shenk, J., voted for a hearing.