THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JACOB POLLACK, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* RAPHAEL LANA, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* RUDOLPH ATLAS, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BELINDA DEMPSEY, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ANNETTE RIZZO, Defendant.

Court of Special Sessions held by a City Magistrate of the City of New York, Borough of Queens, April 3, 1953.

*T. Vincent Quinn*, District Attorney (*Lawrence Peirez* of counsel), for plaintiff.

*Archibald Palmer* for Jacob Pollack and others, defendants.

*Alvin A. Korngold* for Belinda Dempsey and another, defendants.

*Henry A. Wise, Jr.*, for Delaware Wired Music Company, *amicus curiæ.*

SHAPIRO, M. The five defendants before the court are severally charged with the commission of the crimes of conspiracy (Penal Law, § 580), policy (Penal Law, § 974), book-making (Penal Law, § 986), and contriving a lottery (Penal Law, § 1372). Since common questions of law and fact are involved, the cases were tried together.

At the end of the trial, the record of which consists of more than 569 pages of testimony, a myriad number of exhibits, and the exhibition of motion pictures of the defendant Pollack in action, this court stated: " Let me state categorically now that I find all the facts in the case in favor of the People; that does not mean however that I find the conclusions of law contained in the complaints as contended for by the People. I merely find that the ultimate facts have been established sufficiently to convince me beyond a reasonable doubt in those cases where I have jurisdiction as a trier of the facts, and in the other cases sufficiently to hold for the Court of Special Sessions, or for the Grand Jury, as the case may be * * * The ultimate question for determination here is not whether or not the People have established the facts which they claim existed, but whether or not those facts in and of themselves constitute a violation of the Penal Law of the State of New York."

Although, as has been noted, the record in this case is voluminous, the whole question boils down to whether the scheme used by these defendants contravenes existing criminal statutes in this State. The three male defendants entered into an agreement — termed a conspiracy by the People — whereunder the defendant Pollack, from inside the Aqueduct or Jamaica race track, as the case may be, by means of a system of inconspicu-

ous signs, such as touching the nose, right ear, left ear, head, etc., conveyed information to the defendant Lana, who was then stationed at the home of either the defendant Dempsey or the defendant Rizzo, and who through the use of powerful binoculars, and from that vantage point, outside but close by the race track, was able to observe the signs and signals given to him by the defendant Pollack. The information thus received was immediately transmitted to Delaware Wired Music Company, in Delaware, by means of a telephone in either the Dempsey or Rizzo home which was kept open between the two places.

The defendant Atlas was the intermediary between the Delaware Wired Music Company and the other two male defendants and was fully cognizant of and a party to the manner in which the information was obtained by defendant Pollack, conveyed to defendant Lana and transmitted by the latter to Delaware Wired Music Company.

The Delaware Wired Music Company, appearing *amicus curiæ,* contends that it is engaged in the distribution of music over leased wires, and the dissemination of news, including all types of sporting news.

The contention of the People is that the above arrangement was made to enable book-makers to have immediate knowledge of the results of horse races and that persons paying $20 or $25 a day for such racing information to Delaware Wired Music Company must of necessity be persons interested in book-making or other related illegal enterprises.

Horses in races, I am told, sometimes wear blinders. Such a practice should not be indulged in by a court. Alleged judicial naïveté does not require the court to shut from its vision that which is evident to all others. It would not be unreasonable to assume therefore that subscribers willing to pay $20 or $25 a day for such " expedited " racing information were in many cases gentlemen of the gambling fraternity.

Thus the question narrows itself down to whether the transmission of such racing information, with implied knowledge of the fact that upon occasions it may or will be used by book-makers in the furtherance of their illegal enterprises, makes the defendants transmitting such information (the male defendants) and those aiding and abetting them therein (the female defendants), guilty of any or all of the crimes ultimately committed by such book-makers, policy players, etc.

The District Attorney although strenuously maintaining throughout the trial that it does, has failed to submit any brief

to substantiate his contention although an opportunity was afforded him to do so.

Both reason and authority would seem to negate the position taken by the District Attorney, for it is not the information conveyed to the book-makers through the instrumentalities of the defendants and the Delaware Wired Music Company that is illegal, *but it is the use to which that information is put which is illegal.* Many of the New York newspapers devote a great deal of their space to the outpourings of handicappers engaged by them which attempt to predict the outcome of races to be run. Could it seriously be contended that because that information is used by persons to gamble and in book-making that the sports reporters and the newspapers which disseminate such information could be held liable for aiding and abetting in the crime of book-making?

If the contention urged by the People is sound, every manufacturer of playing cards and dice, knowing or being chargeable with the knowledge that in many cases those cards and dice would be used by professional gamblers, would be guilty merely because of the manufacture and distribution of those cards and dice. It is obvious on reflection, that it is not the manufacture of those articles and their distribution that is illegal, but the use to which they are put.

In *Pennsylvania Publications* v. *Pennsylvania Public Comm.* (349 Pa. 184) the Supreme Court of Pennsylvania in considering an activity almost identical to the one now before the court said (pp. 191–192): " We are not so gullible as to suppose that the race results obtained over the telephone from the appellant do not to some extent facilitate the paying off of bets, already placed, and no doubt are used for that purpose by bookmakers. Similarly, the publication by the newspapers of the country or the announcement over the radio of the results of baseball and football games, prize fights and other such activities may be an aid to gamblers, yet no one would seriously contend that the furnishing of such news was against the public policy of this Commonwealth, and therefore such newspapers and radio stations should be deprived of telephone or teletypewriter service. * * * Merely because someone happens to use this sheet illegally is no reason to deprive those who, for reasons which may be perfectly legitimate, also desire to use the service furnished by the complainant."

In the case of *People* v. *Brophy* (49 Cal. App. 2d 15), the defendants submitted racing results to known book-makers by means of telephones. The defendant sent out information which

included probable odds, names of jockeys, etc., and it was conceded that such information was a help to book-makers in that it assisted them in fixing odds and making payoffs. The court in finding that no crime was committed by the transmission of such information said (pp. 33–34): '' Respondent's claim that the furnishing of racing news to bookmaking establishments by telephone constitutes an aiding and abetting in a violation of section 337 a of the Penal Code is without merit. It is not the transmission by use of a telephone of information concerning the results or probable results of horse races that constitutes a violation of the quoted Penal Code section, but it is the use which persons may make of such information in the acceptance of bets or maintaining places for the reception of bets that constitutes a violation of the law. Neither the telephone company nor appellant in his capacity of a subscriber for telephone service was accused in the injunction suit of managing, operating or participating in any gambling place or enterprise maintained for the acceptance of wagers on horse races or other contests of skill between men or beasts; * * *.

'' * * * *Simply because persons who received information transmitted over the telephone facilities were enabled as a result of such information, if they were so inclined, to commit unlawful acts, does not make the telephone company a violator of the criminal laws. If such were the case, the telephone company would likewise be guilty in permitting its facilities to be used in transmitting information to the newspapers of the country as to prospective horse races or prize fights, because the information thus transmitted and published induced or enabled persons to engage unlawfully in betting on the results of such contests.* * * Furthermore, the furnishing or receiving of racing or sporting information is not gambling and is not a crime. (*In re Teletype Machine No. 33335,* 126 Pa. Super 533, [191 Atl. 210, 213].) For well considered and ably reasoned cases supporting the foregoing views, see *Commonwealth* v. *Western Union Tel. Co.,* 112 Ky. 355, [67 S. W. 59], 99 Am. St. Rep. 299, 57 L. R. A. 614, and *State* v. *Shaw,* 39 Minn. 153 [39 N. W. 305].'' (Italics ours.)

In *State ex rel. Dooley* v. *Colman* (126 Fla. 203), the defendants were shown to have received the results of races and thereafter transmitted this information to various subscribers by telephone. The defendants knew that some or all of the subscribers were illegally engaged in book-making and that the service was to be used for that purpose. In holding that the

defendants were not guilty the Supreme Court of Florida said (pp. 205–206): "Telephone service is a public utility facilitating the transmission of communications from one person to another at distant points and it may be reasonably said that such service is frequently used for the communication of information and the transmission of messages in relation to every phase of human activities, including moral and immoral, religious and irreligious, legal and illegal transactions, and it may be said as a matter of general knowledge that whenever a telephone service is established it becomes potentially an aid to the consummation of any plan, scheme, or device which the user thereof may have in mind at any time. * * * *It is no violation of the criminal code that information may be transmitted by means of the telephone concerning the results of a horse race or the results of any other trial of skill or endurance on the part of man or beast, but it is the use which persons make of that information which constitutes the violation of law.*" (Italics ours.) See, also, as expressing the same view, *Commonwealth* v. *Certain Gaming Implements* (57 N. E. 2d 542), and *Tollin* v. *State* (78 A. 2d 810), a case involving a principal officer of Delaware Wired Music Company.

In *People* v. *Engeman* (129 App. Div. 463), which is the only criminal case in this State which this court has been able to find bearing on the point at issue, the Appellate Division, Second Department, held that the publication of a paper conveying advance racing information is not a device or apparatus for gambling, although it may be useful to gamblers and in the placing of wagers. Said the court (p. 467): "the mere fact that it might afford facts which would be useful to the man of sporting proclivities in making up his mind how he desired to place his wager does not constitute it a device for gambling under any of the definitions which we have been able to find."

What has been said here is not to be taken as any indication of approval by this court of the activities of these defendants. The very clandestine and surreptitious manner in which they were performed, and the inferences which may legitimately be drawn from the entire set-up, not all of the facts of which are set forth in this opinion, highlight the need for appropriate legislation in this direction. In its report of "Thoroughbred Racing in the U. S. A." proposed for submission to the "Senate Special Committee to Investigate Organized Crime in Inter-State Commerce", commonly referred to as the Kefauver Committee, the Thoroughbred Racing Protective Bureau said:

"In considering the possibility of a foothold in racing being obtained by organized crime, the stealing of racing information by the nationwide wireless service for bookmakers is of far-reaching and definite interest — *. * * Studies of this nationwide wire service to bookmakers have been made by the Senate Sub-Committee on Interstate and Foreign Commerce, the Chicago Crime Commission, State of California Special Crime Study on organized Crime and the Federal Communications Commission. These studies definitely point out the fact that illegal bookmaking cannot exist on a large scale without prompt information by bookmakers on races being run throughout the United States. This information must include a run down of the odds on each horse in each race as they change prior to the running of the race. It must include the exact time that the race is off and the prompt report of the result of the race including the prices paid. Illegal bookmakers throughout the country, for the most part, pay off at the same odds which are paid at the race track with certain ceiling limitations. Therefore, those who control the wire service to bookmakers and bootleg racing information can control the bookmakers."

In his testimony before the McFarland Senate Sub-Committee on Inter-State and Foreign Commerce, Spencer Drayton, Executive Secretary of the Thoroughbred Racing Protective Bureau, Inc., said: "We would like to make it clear that we feel that this bookmaking wire service is definitely an evil. I don't think there is any more corrupting influence than the bookmaking wire service, and I think that is evidenced by the methods that have been entered into to gain control over the service. I think the murders of James Ragen and Binaggio and Bugsy Siegel show the strong-arm methods used to control this type of service."

From an experience of more than a generation, in dealing with crime and criminals, this court is convinced that unless and until the pulpits, the People and the politicians approach this entire problem of horse racing with candor — not cant, operations in the shadows and twilight zones will continue to plague law enforcement and undermine confidence generally in law enforcement officials.

There being no law in this State to cover the activities of these defendants as herein portrayed, the only remedy would seem to be to refuse them admittance to any race track operating in this State (*Madden* v. *Queens Co. Jockey Club,* 296 N. Y. 249).

Reluctantly therefore, this court determines that in the book-making cases, in which by stipulation this court sat as a Court of Special Sessions, the defendants are found not guilty, and in the remaining cases, the complaints are dismissed and the defendants are discharged.