[Civ. No. 15751.   First Dist., Div. One.   May 21, 1954.]

JOHN WALES, Appellant, v. ELSIE GREENE et al.,
Respondents.

H. H. Van Harvey for Appellant.

Peart, Baraty & Hassard, Joseph S. Rogers, Robert D. Huber and Sullivan, Roche, Johnson & Farraher for Respondents.

WOOD (Fred B.), J.—John Wales filed his complaint herein to rescind his contract to purchase a certain on-sale liquor tavern business. He joined as defendants the seller, Mae Mulligan, his copurchaser, Elsie Greene, and the escrow holder, Bay Counties Escrow Company, a corporation. Each of the defendants answered the complaint, and Mulligan, in addition, cross-complained to enforce the contract. Judgment was rendered that plaintiff take nothing from any of the defendants; that Mulligan recover certain moneys and documents from plaintiff; and that the escrow holder deliver certain moneys and documents to Mulligan.

Plaintiff claims (1) that he terminated the transaction by giving timely notice of cancellation of the escrow, and (2) that the contract of purchase is illegal and not yet executed, hence a contract from which he may withdraw.

### THE FACTS

Defendant Mulligan was the sole owner and operator of the business under a license issued to her in her name. She

had listed the business for sale with the Civic Investment Company of San Francisco.

April 24, 1951, Connett, a representative of the Civic Investment Company, arranged for the sale to plaintiff Wales, for $14,750, payable $9,000 in cash, the balance to be evidenced by a promissory note payable in installments of $300 or more per month, stock on hand to be paid for in cash. Wales paid $1,000 as earnest money.

April 25, 1951, escrow instructions to Bay Counties Escrow Company were filled out and signed by Wales, Nolte and Greene as vendee and Mulligan as vendor. These instructions, in addition to the terms already recited, called for a chattel mortgage securing the balance of the purchase price note, Mulligan to pay Civic Investment Company $1,475 as commission for its services, and that the escrow holder give notice of sale under the Bulk Sales Act and conduct the sale on May 7, 1951.

Wales deposited his check covering the $9,000 down payment and the vendee's share of the escrow fee. Wales, Nolte and Greene signed the note and chattel mortgage but on the same day Nolte withdrew with the consent of all, whereupon a new note and mortgage in the names of Wales and Greene as makers, but signed only by Wales, were placed in escrow. Mulligan signed a notice of intended sale, designating Wales, Nolte and Greene as purchasers, and, upon Nolte's withdrawal, she signed a new notice of intended sale, this time designating Greene as the sole purchaser.

April 30, 1951, Mulligan's lease to the premises was assigned by her to Wales with the consent of the landlord, a consent given without waiver of Mulligan's liability.

May 1st and 4th Wales paid Mulligan $2,276.07 for the stock of liquor on hand. This sale was made by Mulligan with knowledge that the liquor license was to be assigned to Greene. Mulligan delivered possession of the premises May 1st. Certain improvements were made. The business was conducted until about June 20, 1951, when it was closed.

Sometime in June, 1951, the new on-sale license was issued to Elsie Greene by the State Board of Equalization. June 27, 1951, Wales mailed by registered mail notice of rescission and cancellation of the escrow instructions to Elsie Greene and to Bay Counties Escrow Company. The receipt from Bay Counties Escrow Company shows delivery to it on June 29th and the receipt from Elsie Greene shows delivery to her "6/31/51." Plaintiff neither mailed nor delivered

such a notice to defendant Mulligan. He filed his complaint for rescission on July 11, 1951.

### As to Cancellation of the Escrow

Wales predicates his right to rescission upon the fact that evidence that the state board had granted the new liquor license to the vendee had not been received by the escrow holder. All other conditions of the escrow had occurred or been complied with. Wales relies on the following clause of the instructions: "If this escrow is not in condition to close by May 7, 1951, any party who then shall have fully complied with his instructions may, in writing, demand the return of his money and/or instruments deposited in escrow, but if no demand has been so made, then you are instructed to close this escrow at the earliest possible time thereafter." But the instructions did not say whose duty it was to furnish such "evidence." If a duty was cast upon anyone to so report to the escrow holder, a fair inference would be that the parties intended to cast it upon the vendee, not the vendor. ██ Nonperformance of his own obligation could not give Wales a right to rescind as against Mulligan, the nondefaulting vendor. Also, because of his own default, Wales was not a "party who then shall have fully complied with his instructions," hence, by their very terms, not entitled to cancel the instructions.

Moreover, the escrow instructions did not of themselves give either party the unrestricted right to cancel in the event described. The clause above quoted was immediately followed by a provision which accorded the escrow holder the privilege of holding matters in abeyance until receipt of mutual cancellation instructions by all parties: "However, in the event of any demand to cancel this escrow by any party, your company shall have the privilege to withhold and stop all further proceedings in the performance of this escrow until receipt of mutual cancellation instructions by all parties shall have been deposited in this escrow, including those of the herein named broker(s), if any, whereupon you are then instructed to disburse the escrowed funds and instructions accordingly, less your cancellation charges." In the instant case the escrow holder exercised this privilege and no "mutual cancellation instructions" were received by it.

This leaves Wales' asserted right of cancellation to be determined by the general principles of law applicable to Wales' purported rescission of contract, unaffected by the special cancellation provisions of the escrow agreement.

■ Tested by those principles, the facts do not disclose a right in Wales to rescind his contract with Mulligan. Mulligan had performed her every obligation under the contract. No part of the consideration for Wales' obligation has failed through any fault of Mulligan. Wales is not in a position to restore everything of value which was delivered by Mulligan under the contract.* So, he is unable to meet the requirements for rescission of contract. (See Civ. Code, §§ 1689, 1691, and 3406.)

### As to Illegality of Contract

Wales claims that the contract is illegal, that he quit performance while the contract was still executory, and, therefore, is entitled to intercept and recapture from the escrow holder the $9,000 cash deposit and the $4,750 note and chattel mortgage before they reach the hands of Mulligan, the vendor. He further claims that in so doing he is not acting under or in reliance upon the asserted illegal contract.

He presented this issue in his answer to Mulligan's cross-complaint, alleging that he is a citizen of the Dominion of Canada residing in the United States and was not informed until after entering into the agreement in suit that the Alcoholic Beverage Control Act prohibits the sale and transfer of an on-sale liquor license to one not a citizen of the United States; that upon being so informed it was agreed between him and Greene that the on-sale liquor license would be transferred to Greene to be held by her in trust for Wales; all of which Mulligan well knew but did nothing to prevent the transfer of the liquor license held by her and permitted it to be transferred to Greene in violation of law and of the provisions of the Alcoholic Beverage Control Act.

Wales failed to convince the trial court upon this issue. ■ The court found that Wales, as vendee, entered into the contract with Mulligan, as vendor, ''to purchase for Elsie Greene'' the bar and tavern described, and ''pursuant to said contract'' deposited the money, the note and the mortgage in escrow. This finding clearly negatives the existence of any intent to evade the statute† which proscribes the issuance

---

*The business was terminated about June 20, 1951, due, it would appear, to differences between Wales and Greene in which Mulligan was not at all involved. The license, by Wales' consent, was issued to Greene and has been sold by Greene to another person; hence wholly beyond the power of Wales to restore to Mulligan.

†Section 12 of Alcoholic Beverage Control Act, 2 Deering's Gen. Laws, Act 3796, now section 23788 of the Bus. & Prof. Code.

of a liquor license to an alien. ■ Greene is not an alien and a contract for her benefit is not an illegal contract for the benefit of an alien.

The court also found that "Mae Mulligan, at the direction of John Wales, turned over to Elsie Greene the possession of said premises and business, together with the fixtures, equipment and good will thereof," also at his direction, Mulligan turned over to Greene the stock in trade used in the business; and at his direction Mulligan caused her on-sale general liquor license to be transferred to Elsie Greene; also that "Mae Mulligan had no knowledge of the citizenship of . . . John Wales until a time subsequent to the transfer of the possession and control" of the business, together with stock in trade, fixtures, equipment and good will.

These findings are supported by the evidence, some of which is summarized below. ■ Wales met Greene while the latter was working as a waitress. They then started going out together socially two or three times a week. Wales told her he wanted to buy her a bar business because he felt sorry for her; she was working too hard as a waitress. Wales introduced Greene to Connett and told Connett he was considering getting a business for her. All of the proceeds of the bar were to be Greene's after the bills were paid. The bar was supposed to be a gift to her. Wales had no interest in the license, it was a gift to her. The only reason the license was put in her name was because it was a gift to her. The fact that Wales was not a citizen had nothing to do with it. The bar license was always supposed to be in her name. Upon his deposition, which was introduced in evidence, Wales testified it was not until after his dispute with Greene developed and he had locked the place up (after June 20, 1951) that he learned it was illegal for him to hold the liquor license.

Mulligan testified it was not until the middle of June, 1951, that she learned Wales was an alien. Mulligan's understanding was that Greene was to handle the business. She knew that the license was to be placed in the name of Greene. She signed a notice of intended sale of the business to Greene. Wales told her he would assume the lease but wanted Greene and Nolte on the liquor license; later, Wales informed her he wanted to take Nolte off the license, that Miss Greene was going to be on the license; he wanted Mulligan to put Greene's name on the license.

Under the circumstances there is no basis for a conclusion that illegality tainted the transaction whereby Mulligan sold

her business to Wales for the benefit of Greene and in good faith completely performed every obligation upon her part to be performed. Her utter lack of fault was frankly recognized by Wales when, upon deposition, he gave the following answers to the following significant questions: "Q. And, as a matter of fact, it is your position, is it not, Mr. Wales, that the failure of this deal to go through as contemplated arose directly and unquestionably out of your dispute with Miss Elsie Greene; isn't that right? A. That is correct. Q. And Mrs. Mae Mulligan had nothing whatsoever to do with that dispute, did she? A. No. Q. That was a dispute that existed solely and entirely between yourself and Elsie Greene, wasn't it? A. Yes, sir. Q. So that to sum the whole thing up, Mr. Wales, isn't this exactly true, now, Mrs. Mae Mulligan did everything that she could possibly do to perform her side of the agreement? A. Yes, sir."

Even if he harbored an intent to evade the statute, she was no party to any scheme to circumvent the law. Without knowledge of any such scheme or of any basis for it, she has done nothing which requires the courts, in furtherance of the public interest, to deny her any of the remedies normally accorded a nondefaulting vendor against a vendee who seeks to avoid performance of his contract. (See *California Raisin Growers' Assn.* v. *Abbott,* 160 Cal. 601, 607-609 [117 P. 767]; *Moore* v. *Russell,* 114 Cal.App. 634, 639-640 [300 P. 479]; *Gallick* v. *Castiglione,* 2 Cal.App.2d 716 [38 P.2d 858]; *People* v. *Brophy,* 49 Cal.App.2d 15, 30-31 [120 P.2d 946]; 166 A.L.R. 1353-1412.) Accordingly, we do not have occasion to determine whether Wales' defense of illegality, if it had been proved as pleaded, would have required a reversal of the judgment.

■  Wales contends that the question whether he bought the business for the benefit of Greene was not an issue in the case. He is mistaken. He relies upon the fact that Mulligan in her cross-complaint alleged an agreement to sell the business (together with the stock in trade, fixtures and good will), to Wales, Greene and Nolte, an allegation which in his answer he admitted. At the trial, the parties ignored this admission and submitted proof that Nolte withdrew, leaving Wales and Greene to consummate the transaction, and that Wales only, not Greene, signed the note and chattel mortgage for the balance of the purchase price. Also, in his answer he alleged that the sale included the on-sale liquor license, presenting an issue concerning the identity of the transferee contemplated by the parties. Moreover, the defense of illegality which the

same answer set up included by necessary implication the very issue which Wales erroneously questions. Finally, Greene and Mulligan's respective answers to the complaint were sufficiently sweeping in their denials to include this issue.

The conclusion is inescapable that the judgment should be affirmed.

### THE MOTION TO DISMISS THE APPEAL

There remains for consideration defendant Mulligan's motion to dismiss the appeal upon the ground that the issues are moot, the escrow holders having delivered the money, the note and the chattel mortgage to the seller pursuant to the judgment. Appellant had failed to stay the judgment pending his appeal. That does not amount to voluntary satisfaction of judgment which would preclude the party aggrieved from prosecuting his appeal. Moreover, there are factors involved which call for consideration of the merits of the case in determining the issues presented by the motion. Accordingly, the motion should be denied.

The judgment is affirmed and the motion to dismiss the appeal is denied.

Peters, P. J., and Bray, J., concurred.