[S.F. No. 23714. Mar. 15, 1979.]

MARVIN GOLDIN, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
GENERAL TELEPHONE COMPANY OF CALIFORNIA,
Real Party in Interest.

640

642

644

## COUNSEL

Paul J. Fitzgerald for Petitioner.

Janice E. Kerr, Hector Anninos and Scott K. Carter for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Alan S. Meth, Deputy Attorneys General, as Amici Curiae on behalf of Respondent.

No appearance for Real Party in Interest.

## OPINION

**MANUEL, J.**—Twelve years ago this court, in the case of *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265], struck down on constitutional grounds the then existing rule for discontinuance of telephone service used for illegal purposes and announced the standard which any future rule must meet. "[W]hatever new procedure is hereafter devised," we held, "must at a minimum require that the police obtain prior authorization to secure the termination of service by satisfying an impartial tribunal that they have probable cause to act, in a manner reasonably comparable to a proceeding before a magistrate to obtain a search warrant. In addition, after service is terminated the subscriber must be promptly afforded the opportunity to challenge the allegations of the police and to secure restoration of the service. A procedure incorporating these measures would provide substantial protection to the subscriber without hindering the enforcement of [the] laws." (65 Cal.2d at p. 256.)

Following this decision the Public Utilities Commission (Commission) undertook further proceedings directed toward the development of a rule consistent with the aforesaid standard. The result was the present rule, known as rule 31,[1] the provisions of which are set forth in the margin.[2] Generally speaking, rule 31 provides that service shall be refused or disconnected upon receipt by the Commission from any authorized law enforcement official of a writing signed by a magistrate finding "that probable cause exists to believe that the use made or to be made of the service is prohibited by law, or that the service is being or is to be used as an instrumentality, directly or indirectly, to violate or to assist in the violation of the law." The subscriber or any person aggrieved by action taken pursuant to this standard is to receive immediate notice and has the right to immediately file a complaint with the Commission in which he may request interim relief pending proceedings on the complaint; this shall be the exclusive remedy. Any concerned law enforcement agency shall have the right to notice of any hearings and the right to full participation therein in the role of prosecutor. It shall bear the twin burden of proving violation of the rule and of persuading the Commission that the service should be refused or not restored. Each application or contract for communications service is deemed to contain the provisions of the rule, and all applicants for service are deemed to have consented to its provisions.

---

[1]Schedule California Public Utilities Commission No. D & R, Advice Letter No. 1877, based on Appendix "A" of Commission Decision No. 71797, issued December 30, 1966.

[2]"1. Any communications utility operating under the jurisdiction of this Commission shall refuse service to a new applicant, and shall disconnect existing service to a subscriber, upon receipt from any authorized official of a law enforcement agency of a writing, signed by a magistrate, as defined by Penal Code Sections 807 and 808, finding that probable cause exists to believe that the use made or to be made of the service is prohibited by law, or that the service is being or is to be used as an instrumentality, directly or indirectly, to violate or to assist in the violation of the law.

"2. Any person aggrieved by any action taken or threatened to be taken pursuant to this rule shall have the right to file a complaint with the Commission and may include therein a request for interim relief. The remedy provided by this rule shall be exclusive. No other action at law or in equity shall accrue against any communications utility because of, or as a result of, any matter or thing done or threatened to be done pursuant to the provisions of this rule.

"3. If communications facilities have been physically disconnected by law enforcement officials at the premises where located, without central office disconnection, and if there is not presented to the communications utility the written finding of a magistrate, as specified in paragraph 1 of this rule, then upon written request of the subscriber the communications utility shall promptly restore such service.

"4. Any concerned law enforcement agency shall have the right to Commission notice of any hearing held by the Commission pursuant to paragraph 2 of this rule, and shall have the right to participate therein, including the right to present evidence and argument and to present and cross-examine witnesses. Such law enforcement agency shall be entitled to receive copies of all notices and orders issued in such proceedings and shall

In the instant proceeding for review we confront an extensive attack, on constitutional as well as other grounds, upon rule 31 and its application in this case. For reasons to be set forth below, we have concluded that this attack, in light of the circumstances here presented, must be rejected. We affirm the order and decision of the Commission.

I

In the spring of 1975 the Sheriff's Department of Los Angeles County and the Police Department of the City of Los Angeles instituted an investigation of complaints indicating that the business of prostitution was being carried on on an outcall basis through massage parlors and related businesses. In the course of this investigation, which continued through 1976, officers of the said agencies discovered information leading them to believe that certain businesses operated by petitioner as telephone answering services were in fact being used for the indicated illicit purpose. On March 7, 1977, Judge Mary E. Waters of the Los Angeles

have both (1) the burden of proving that the use made or to be made of the service is prohibited by law, or that the service is being or is to be used as an instrumentality, directly or indirectly, to violate or to assist in the violation of the law, and (2) the burden of persuading the Commission that the service should be refused or should not be restored.

"5. The utility, immediately upon refusal or disconnection of service in accordance with paragraph 1 of this rule, shall notify the applicant or subscriber in writing that such refusal or disconnection has been made pursuant to a request by a law enforcement agency, naming the agency, and shall include with said notice a copy of this rule together with a statement that the applicant or subscriber may request information and assistance from the Commission at its San Francisco or Los Angeles office concerning any provision of this rule.

"6. At the expiration of fifteen days after refusal or disconnection of service pursuant to paragraph 1 of this rule, the utility, upon written request of the applicant or subscriber, shall provide or restore such service unless the law enforcement agency concerned shall have notified the utility in writing of its objection to such provisions or restoration of service, in which event service may be provided or restored only in a complaint proceeding pursuant to paragraph 2 of this rule. At the time of giving any such notice of objection, the law enforcement agency shall mail or deliver a copy thereof to the applicant or subscriber. Nothing in this paragraph shall be construed to preclude the granting of interim relief in a proceeding initiated pursuant to paragraph 2 of this rule.

"7. Each contract for communications service, by operation of law, shall be deemed to contain the provisions of this rule. Such provisions shall be deemed to be a part of any application for communications service. Applicants for service shall be deemed to have consented to the provisions of this rule as a consideration for the furnishing of such service.

"8. The term 'person,' as used herein, includes a subscriber to communications service, an applicant for such service, a corporation, a company, a copartnership, an association, a political subdivision, a public officer, a governmental agency, and an individual.

"9. The term 'communications utility,' as used herein, includes a 'telephone corporation' and a 'telegraph corporation,' as defined in Division 1 of the California Public Utilities Code."

Municipal Court, having been presented with an extensive affidavit and other materials reflecting this information, signed a document entitled "Finding of Probable Cause" which indicated the existence of probable cause to believe that certain telephone numbers listed in the affidavit and located at two addresses within the county "[were] being utilized for illegal purposes." This document was duly served upon the real party in interest General Telephone Company of California (General), and on March 11, 1977, the company terminated the telephone service with respect to 39 of the indicated telephone numbers as to which General was the supplier and petitioner was the subscriber.

On March 14, 1977, petitioner filed a complaint with the Commission which alleged inter alia that he operated a legitimate telephone answering service business and had not used the subject telephones for any illegal purpose, asserted that rule 31 and its application herein were unconstitutional and void, and requested an order directing General to immediately restore service or, in the alternative, to grant interim relief pending the conclusion of hearings on the complaint. Pursuant to paragraph A of rule 31 the Commission notified the District Attorney of Los Angeles County, the county sheriff, and the Los Angeles Chief of Police of the filing of the complaint and the date, time and place of the hearing. All of these filed petitions to intervene, and an answer on behalf of the interveners was filed by the district attorney who, inter alia, sought an order denying the request for interim relief.

Hearings on petitioner's complaint were held at which the interveners, over petitioner's objection, were permitted to produce evidence and act as prosecutors. The hearing officer, on motion of the interveners, quashed a subpoena compelling the attendance and testimony of Judge Waters. At the conclusion of the hearings the hearing officer ruled that the procedures authorized by rule 31 were legal and valid, that such procedures had here been followed, that a sufficient basis existed for the finding of probable cause, and that the request for interim relief should be denied.

The question of interim relief was then submitted to the full Commission for decision, and on April 5, 1977, the Commission issued an order granting such relief "to prevent any undue business hardship pending our final determination." It was further ordered that the restoration of service on an interim basis should be subject to the payment of reconnection charges by petitioner.

On July 26, 1977, the Commission issued its final decision. It therein found and concluded inter alia that the provisions of rule 31 were consistent with the requirements set forth by this court in *Sokol* and moreover were "consistent with the requirements of due process of law, equal protection of the laws, and the right of freedom of speech, as required by the California and United States Constitutions and other laws pertinent thereto"; that the provisions of rule 31 had been complied with in all respects; and that the interveners had "satisfied their burden of proof as required by paragraph 4 of Rule 31." It further found and concluded inter alia that petitioner's telephone service was used during the period in question "directly and indirectly, to assist in the violation of the law, to wit, Section 647(b) of the Penal Code [soliciting or engaging in acts of prostitution]." It was ordered that the interim relief previously granted should be terminated, and that General and the Pacific Telephone and Telegraph Company (Pacific)[3] should thereafter "refuse new business service to [petitioner] or any entity in which he has financial or managerial control, at any location in California, without further order of this Commission."[4]

Subsequent petitions for vacation of the order terminating interim relief and for rehearing were denied. We granted petitioner's application to this court for a writ of review in order to examine rule 31 and its application in light of recent decisions of this court and the United States Supreme Court.

## II

A relatively brief statement of the substance of the extensive evidence presented before the Commission will suffice for our purposes.

Twenty male police officers gave evidence on behalf of the interveners. Of these, each of 17 testified in essence that he had placed a call to a telephone number assigned to petitioner which he had obtained from a pictorial newspaper advertisement offering outcall massage or nude modelling services; that as a result of the call a woman was dispatched and arrived at hotel or motel accommodations where the officer was located; that after stating the price of the massage or nude modelling service ($35 to $40) and indicating that she herself received only a small

---

[3]The Commission indicated that the prohibition was to be extended to Pacific as well as to General because the two are "coterminous utilities in the Southern California area."

[4]It was also ordered that petitioner's application for rehearing with respect to the decision granting interim relief be denied.

portion ($5 to $10) thereof, the woman (in 16 of the 18 cases detailed) offered to perform various acts of a sexual nature, including sexual intercourse, for a sum ranging from $40 to $100 over and above the cost of the advertised service; and that in these 16 cases the woman was thereupon arrested for violation of Penal Code section 647, subdivision (b).

A female police officer, also appearing for the interveners, testified in essence that she telephoned a number assigned to petitioner which she had obtained from a newspaper advertisement which stated "sexy and beautiful girls wanted for outcall massage, $500 a week guaranteed"; that she was directed to and subsequently did meet petitioner at a restaurant to discuss the indicated employment; that in the course of the ensuing conversation petitioner indicated that he was the operator of the service and made several comments (the specifics of which appear in the record) indicating that the purpose and intent of his service was that of providing contacts for prostitutes; that petitioner also indicated that if the witness were employed she would be fired if arrested; that petitioner further indicated that prior to and as a condition of employment she would be required to first come to his apartment and have sexual intercourse with him; and that it was further stated that the proceedings at the apartment would be taped in order to make sure that the witness was not a policewoman. The same witness also testified that she was present during the execution of a search warrant at petitioner's apartment; that while there she answered the telephones when they rang; that among the calls received were several from women requesting to be sent out on calls or reporting having cleared the identification of clients at locations to which they had been dispatched; and that two of these were directed to addresses where police officers were located and both were subsequently arrested.

The deputy sheriff in charge of the investigation testified that while in the process of serving and executing a search warrant at petitioner's business premises (where the 39 telephones here in question were located) he seized several items of property, all of which were admitted into evidence before the examiner and appear among the exhibits before this court. Among these items were various lists and notes, some of which appear to relate to applications for employment, such notations including not only the applicant's name, address, and telephone number but also information such as height, weight, physical dimensions, and hair color as well as comments which, in the opinion of the witness, indicated the character of sexual activity in which the applicant would or would not

engage. Other notes included one entitled "heat sheet, suspected police officers," containing an alphabetical list of names.

Also admitted into evidence was a selection of newspaper advertisements bearing one or more of the 39 General telephone numbers subscribed to by petitioner. Some of these advertisements contained pictures of semi-nude women and contain language which, while we do not repeat it here, graphically suggested that sensual pleasures more intimate than massage or visual stimulation were offered.

Petitioner did not testify in his own behalf, but he offered three witnesses. The first, a woman 19 years of age, testified in essence that she had been unhappy in her previous employment as a waitress and, after hearing from her stepmother about job opportunities with petitioner, made application for employment; that during her employment interview she had been told that if she performed any act of prostitution on the job she would be fired; that as a part of her application she signed a document indicating her understanding of this fact (which document appears among the exhibits herein); that her working shift was 10 hours, during which she normally serviced four calls; that she averaged $50 per night, comprising the $5 per call which she received plus tips given by the customers; that her customers, judged by what they told her, covered the full range of professions, and most of them merely wanted to talk and appeared to be lonesome; that she refused to perform services for more than one person at a time, did not perform "dominant massage," consisting of physical abuse of the customer, and would not massage the genital area. The witness also explained the telephone dispatch procedure by which she was put in contact with her customers by petitioner. She indicated that she never performed services for known police officers, her friends having advised her against 'it. Finally, she stated that although some of her friends had solicited and committed prostitution while employed by petitioner, she had never done so.

Petitioner's second witness was one of his telephone dispatchers. She indicated that she had also performed other services for petitioner such as hiring and firing employees, booking appointments and keeping daily business records. Explaining the dispatch procedure in detail, she indicated that many callers inquired whether sexual services were offered, but when that occurred she merely hung up the telephone, and if the person called back she would state that such service was not available. She did, however, inform callers that masseuses and models would accept tips, just as waitresses, bellmen, or masseurs would. She further explained

certain precautions that were taken for the safety of the women employees, including a call by the woman to the service after arrival at the customer's location, a call to the location by the dispatcher after an appropriate period when the service should have been completed, and occasional calls to the police in emergency situations. She also explained the use of certain of the items of property in evidence which had been seized, including a map with pins by which the location of various employees was kept track of, and of the various lists of undesirable callers, including police, pranksters, and those who have physically hurt employees. Police, she stated, were avoided because several employees had complained of being arrested without cause when sent to a police officer. The witness also explained so-called "dominant" services, or those involving abuse of the customer; she indicated that "light dominance," involving bondage and light physical or verbal abuse, was provided, but that "English dominance," involving whipping and other activities causing severe pain, was not. She also stated that she knows of no instance wherein any employee has solicited any act of prostitution, but that she knows of 15 occasions wherein employees have been arrested for doing so; in essentially all cases in which an employee is dispatched to a police officer, the witness explained, the employee is arrested and goes to jail. She also indicated, however, that seven or eight girls a year were terminated for solicitation.

Petitioner's final witness was an employee who had been arrested in one of the cases earlier testified to by police officers. She recounted the event and indicated that she had not solicited an act of prostitution on the occasion in question, although she was arrested therefor. Her testimony in these respects conflicted with that of the officer involved.

## III

As indicated above, the Commission found and concluded on the basis of the foregoing evidence that petitioner's telephone service had been used during the period in question "directly and indirectly, to assist in the violation of the law, to wit, Section 647(b) of the Penal Code." This determination is not, in our view, subject to review by this court in the instant proceeding. Our scope of review is delineated in section 1757 of the Public Utilities Code as follows: ". . . The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State. [¶] The findings and

conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination." The provisions of section 1760 of the same code, authorizing an independent judgment on the law and the facts in cases in which an order or decision is challenged on constitutional grounds, do not authorize this court to substitute its own judgment as to the weight to be accorded evidence before the Commission or the purely factual findings made by it. (*Huntley* v. *Public Util. Com.* (1968) 69 Cal.2d 67, 71 [69 Cal.Rptr. 605, 442 P.2d 685]; *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 646 [44 Cal.Rptr. 1, 401 P.2d 353].) Accordingly for the purposes of this proceeding we accept the finding of the Commission, which we conclude to be amply supported, that the telephones here in question were used by petitioner to assist, directly and indirectly, in the violation of the provisions of section 647, subdivision (b) of the Penal Code. We proceed to address ourselves to the substantive contentions raised.

### IV

The numerous legal contentions advanced by petitioner may in our view be placed in three general categories: (1) contentions questioning the validity of the rule itself, (2) contentions questioning its application in the instant case, and (3) contentions asserting irregularities in the Commission's decision. We address the contentions in each of these categories together, first turning our attention to the question of the validity of the rule viewed on its face.

(a) *Jurisdiction*

It is first asserted that the decision of the Court of Appeal in *Mason* v. *Western Union Telegraph Co.* (1975) 52 Cal.App.3d 429 [125 Cal.Rptr. 53] (hg. den.) casts serious doubt upon the Commission's power to discontinue telephone service for illegal use thereof. We do not so read the *Mason* case, which in our view holds no more than that a telegraph company may not be held civilly liable for sending a message alleged to be libelous, such a communication falling within the privilege set forth in Civil Code section 47, subdivision 3. Indeed the opinion, through its citation and discussion of Public Utilities Code section 7904, strongly implies that such service may be refused for messages deemed to be "calculated . . . to instigate or encourage the perpetration of any unlawful act." (§ 7904.)

Petitioner's contention wholly ignores the clear implication of our *Sokol* decision, wherein we indicated that although the Commission rule there in question—which permitted a utility to summarily discontinue service without authorization and without provision for prompt challenge by the subscriber—could not withstand constitutional scrutiny, a procedure which properly remedied those deficiencies would indeed pass constitutional muster and would lie within the jurisdiction of the Commission to promulgate and enforce.

(b) *Free speech*

■ Strongly relying on certain language in our *Sokol* decision, petitioner contends that the restraint on communication effected by rule 31 affects his rights to free speech under the First Amendment. In the indicated language we stated: "It is . . . significant that the disconnection of telephones not only may deprive the subscriber of the monetary value of his economic venture, but in such circumstances denies him an essential means of communication for which there is no effective substitute. Hence, this restraint on communication by the subscriber also affects his right of free speech as guaranteed by the First Amendment of the federal Constitution. 'Inasmuch as the rights of free speech and press are worthless without an effective means of expression, the guarantee extends both to the content of the communication and the means employed for its dissemination.' (*Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241-242 [49 Cal.Rptr. 537, 411 P.2d 289].)" (65 Cal.2d at p. 255.)

We accept the invitation of amicus curiae to reexamine this language in light of certain intervening decisions of the Supreme Court of the United States. The first and most significant of these in our view is that in *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376 [37 L.Ed.2d 669, 93 S.Ct. 2553], which was handed down by the high court some seven years after *Sokol.* In that case the City of Pittsburgh had passed a human relations ordinance which, as construed by the courts of Pennsylvania, in general forbade newspapers from carrying "help wanted" advertisements in sex-designated columns. Proceedings for violation of the ordinance were instituted against a newspaper before the commission charged with the enforcement of the law, which issued a cease and desist order. The order was subsequently upheld in the state courts, and the newspaper, urging violation of the First Amendment, sought relief in the Supreme Court.

The high court affirmed. Addressing its attention initially to the so-called "commercial speech" doctrine first set forth in *Valentine* v. *Chrestensen* (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct. 920] (under which "purely commercial" speech is withdrawn from First Amendment protection) and observing that certain inroads had been made on that doctrine by subsequent cases involving politically hortatory commercial advertising (notably *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]), the court sought to place the case before it within the spectrum of protection thus created, concluding that *Chrestensen* was the more applicable precedent in the circumstances. The newspaper company, however, went on to argue that *Chrestensen* should be limited or overruled and the distinction between commercial and other speech abrogated.

The high court's response to this suggestion is peculiarly apposite to the facts before us: "Whatever the merits of this contention may be in other contexts, it is unpersuasive in this case. Discrimination in employment is not only commercial activity, it is *illegal* commercial activity under the Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned 'Narcotics for Sale' and 'Prostitutes Wanted' rather than stated within the four corners of the advertisement." (413 U.S. at p. 388 [37 L.Ed.2d at pp. 678-679]; fn. omitted.) In summary the high court stated: "*Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.*" (*Id.,* at p. 389 [37 L.Ed.2d at p. 679]; italics added.) The court went on to conclude that no prior restraint on expression was here involved because the order in question "does not endanger arguably protected speech." (*Id.,* at p. 390 [37 L.Ed.2d at p. 680].)

Also relevant to our determination is the case of *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]. There the Supreme Court, presented with a proper case for reexamination of the "commercial speech" doctrine, held that a Virginia statute forbidding pharmacists from advertising the prices of prescription drugs invalidly affected speech within the protection of the First and Fourteenth Amendments even though the interest of the advertiser

was a purely economic one.[5] The court made clear, however, that its holding did not extend to commercial speech whose subject matter was an illegal transaction. "There is no claim," the court noted, "that the transactions proposed in the forbidden advertisements are themselves illegal in any way. Cf. *Pittsburgh Press Co.* v. *Human Relations Comm'n.,* 413 U.S. 376 (1973) . . . ." (425 U.S. at p. 772 [48 L.Ed.2d at p. 365].) "What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about *entirely lawful activity,* fearful of that information's effect upon its disseminators and its recipients. Reserving other questions, we conclude that the answer to this one is in the negative." (*Id.,* at p. 773 [48 L.Ed.2d at p. 365]; italics added; fn. omitted.) (See also *Carey* v. *Population Services International* (1977) 431 U.S. 678, 700-702 [52 L.Ed.2d 675, 694-696, 97 S.Ct. 2010].)

Finally, we take note of the recent case of *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]. There the high court held that the principles announced in the *Virginia Pharmacy* case precluded the application of a disciplinary rule forbidding attorney advertising to the particular advertisements before the court,[6] which it characterized as "truthful [newspaper] advertisement concerning the availability and terms of routine legal services." (*Id.,* at p. 384 [53 L.Ed.2d at p. 836].) Here again, however, the court was careful to emphasize the outer limits of the emerging "commercial speech" doctrine. "*Advertising concerning transactions that are themselves illegal obviously may be suppressed.* See *Pittsburgh Press Co.* v. *Human Relation Comm'n* . . . ." (433 U.S. at p. 384 [53 L.Ed.2d at p. 836]; italics added.)

---

[5]The court was careful to emphasize that the admission of "commercial speech" into the realm of protected expression did not mean that it was thereby exempted from regulation. "There are commonsense differences," the court stated in a carefully worded footnote, "between speech that does 'no more than propose a commercial transaction,' *Pittsburgh Press Co.* v. *Human Relations Comm'n., 413* U.S., at 385, and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired . . . . [¶] Attributes such as . . . the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. [Citations.] They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive. [Citations.] They may also make inapplicable the prohibition against prior restraints. [Citations.]" (425 U.S. at pp. 771-772, fn. 24 [48 L.Ed.2d at p. 364].)

[6]In the course of its opinion the court, relying on the "commonsense differences" between commercial and other protected speech to which it had adverted in the *Virginia Pharmacy* case (see fn. 5, *ante*), held that the First Amendment overbreadth doctrine (see e.g., *Bigelow* v. *Virginia* (1975) 421 U.S. 809, 815-818 [44 L.Ed.2d 600, 607-610, 95 S.Ct. 2222]) was not applicable in the former context. Accordingly, appellants were required to

The foregoing three cases, although factually different in many respects from that now before us, in our view establish certain principles essential to our determination here. ▮ Advertising, we believe, may not be validly distinguished from other forms of speech which do "no more than propose a commercial transaction" (*Pittsburgh Press Co.* v. *Human Rel. Comm'n., supra,* at p. 385 [37 L.Ed.2d at p. 677]) in terms of the availability *vel non* of First Amendment protections and the forms of limitation upon such "commercial speech" which are constitutionally permissible under the standards discussed in the *Virginia Pharmacy* case. (See fn. 5, *ante.*) Thus we believe that telephone communication which does "no more than propose a commercial transaction" can be, as we suggested in *Sokol,* protected "commercial speech." ▮ By the same token, however, when such communication proposes, discusses, or is intended to encourage or facilitate a commercial transaction *which is itself illegal,* the principle established in the *Pittsburgh Press* case is applicable. Thus: "Any First Amendment interest which might be served by [telephone communications concerning] an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation *is altogether absent* when the commercial activity itself is illegal and the restriction on [telephone communication] is incidental to a valid limitation on economic activity." (413 U.S. at p. 389 [37 L.Ed.2d at p. 679]; italics added.) In short, telephone communication of the character herein involved is not protected speech within the meaning of the First Amendment. Thus, it is subject to total suppression by means of an otherwise valid limitation. (See *Bates* v. *State Bar of Arizona, supra,* 433 U.S. at p. 384 [53 L.Ed.2d at p. 836].)[7]

We are thus brought to the second major question before us: Is the particular limitation here involved an "otherwise valid" one? Petitioner

demonstrate that their specific conduct was constitutionally protected. (433 U.S. at pp. 379-381 [53 L.Ed.2d at pp. 832-834].)

[7]While it is one thing to say that purely ·commercial speech relating to an illegal transaction is not entitled to First Amendment protection and may be suppressed under any otherwise valid regulations, of course it is quite another to suggest that a means of business communication used for the discussion of legal transactions as well as illegal transactions may be discontinued because of the latter use. In this case the Commission indicated, however, on the basis of abundant evidence in the record, that the 39 business telephone lines here in question were an adjunct of petitioner's massage and nude modelling referral business, and that as such they were used "continually and systematically . . . to facilitate . . . prostitution activities." In these circumstances, and for reasons to be stated in the discussion to follow, we decline to hold on this record that the Commission's action, if it was otherwise lawful, was forbidden on a constitutional basis because of the mere possibility of occasional legitimate use of the subject lines.

argues that it is not, urging among other things (1) that it is vague and overbroad, (2) that it operates to permit the taking of property without due process of law, (3) that its provisions are inconsistent with the requirements set forth by us in *Sokol,* and (4) that the proceedings leading up to its adoption were not in accordance with law. We take up each of these contentions in order.

(c) *Vagueness and overbreadth.*

Petitioner raises a number of arguments to the effect that rule 31 is unconstitutionally vague and overbroad—going to great and imaginative lengths to point out the possibilities of abuse and capricious application which are inherent in its terms. While we recognize the dangers to which he adverts, for reasons to be stated below we do not believe that it lies in his mouth to raise them.

■ With respect to the matter of vagueness petitioner places heavy reliance on the case of *Palmer* v. *City of Euclid* (1971) 402 U.S. 544 [29 L.Ed.2d 98, 91 S.Ct. 1563], wherein the Supreme Court, in a short per curiam opinion, struck down a city's "suspicious person ordinance" on the ground that it failed to give " 'a person of ordinary intelligence fair notice that his contemplated conduct is forbidden . . . .' *United States* v. *Harriss,* 347 U.S. 612, 617 (1954)." (*Id.,* at p. 545 [29 L.Ed.2d at p. 100].) He notes that one element of the conduct forbidden by the ordinance there in question was that a person be without visible or "lawful" business, just as the rule here in question permits discontinuance of service to one using his telephone "to violate or to assist in the violation of the law." He fails to note two other important considerations, however. The first is that the ordinance in question in *Palmer,* as the concurring opinion of Justice Stewart makes clear, was not struck down as being vague on its face but rather as applied to the case before the court. "[T]here is no suggestion whatsoever," the majority opinion pointed out, "that what [appellant] did was unlawful under local, state, or federal law. If his conduct nevertheless satisfied the being-without-visible-or-lawful-business element of the ordinance, as the state courts must have held, it is quite unreasonable in our view to charge him with notice that such would be the construction of the ordinance. 'The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' " (*Id.,* at p. 546 [29 L.Ed.2d at p. 100].) Here, on the other hand, as we have pointed out, petitioner's conduct as well as the conduct which he was in the business of facilitating were both unlawful, and

clearly so. Accordingly, he cannot be heard to complain that it is unreasonable to charge him with notice that the rule would be construed to include his conduct. As the court said in *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, at page 608 [37 L.Ed.2d 830, 837-838, 93 S.Ct. 2908]: "[E]ven if the outermost boundaries of [the regulation] may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of [its] proscriptions . . . ."[8]

Secondly, it is to be pointed out that *Palmer* involved an ordinance whose violation, unlike that of the rule here in question, resulted in the assessment of *criminal* penalties. Although enactments outside the criminal area have occasionally been subjected to scrutiny on grounds of vagueness—especially in cases involving the right to practice a recognized profession (see, e.g., *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 220-233 [82 Cal.Rptr. 175, 461 P.2d 375]; *Hall* v. *Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 490-495 [138 Cal.Rptr. 725]; *Goldberg* v. *Barger* (1974) 37 Cal.App.3d 987, 991 [112 Cal.Rptr. 827]; *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 766-773 [4 Cal.Rptr. 910]), or the exercise of other fundamental rights (see *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734, 739-742 [227 P.2d 449]; *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 728-732 [198 P.2d 17])—we have normally limited such examination to situations in which First Amendment rights have been at stake (see *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 661-663 [97 Cal.Rptr. 320, 488 P.2d 648]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 866 [94 Cal.Rptr. 777, 484 P.2d 945]; *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684, 690-697 [68 Cal.Rptr. 721, 441 P.2d 281]; but see *Broadrick* v. *Oklahoma, supra,* 413 U.S. 601, 608 [37 L.Ed.2d 830, 837]; and cf. *Sunset Amusement Co.* v. *Board of Police Commissioners* (1972) 7 Cal.3d 64, 72-73 [101 Cal.Rptr. 768, 496 P.2d 840]; *Katz* v. *Department of Motor Vehicles* (1973) 32 Cal.App.3d 679, 684 [108 Cal.Rptr. 424]). In the circumstances of the instant case, where neither the protections of the First Amendment nor any other fundamental right of similar stature is directly involved, we do not deem such an examination appropriate. This is not to say, of course, that in some future case wherein such rights are more arguably involved we will not proceed to undertake it. (See also fn. 7, *ante.*)

---

[8]It is interesting to note that whereas the appellants in *Broadrick* were held to be without standing to raise possible facial vagueness in the enactment there in question, they were held to have standing to raise the issue of facial overbreadth, which we consider below, because the case arose in a First Amendment context. (413 U.S. at pp. 609-615 [37 L.Ed.2d at pp. 838-842].)

We reach a similar conclusion on the question of overbreadth. It should also be noted, moreover, that in *Bates* v. *State Bar of Arizona, supra,* 433 U.S. 350—where as noted above the Supreme Court applied the principles developed in the *Virginia Pharmacy* case to hold that certain attorneys' advertisements were entitled to First Amendment protection—the high court held that the disciplinary rule there involved would not be examined for facial overbreadth and required appellants to demonstrate that their own conduct could not be regulated by a more specifically drawn regulation. In so doing the court concluded that the facial overbreadth doctrine would not be applied in cases involving no more than "commercial speech." (433 U.S. at pp. 380-381 [53 L.Ed.2d at pp. 833-834].)[9] Thus, even if the speech here involved were entitled to that quantum of First Amendment protection accorded to "commercial speech" (see fn. 5, *ante*), which it is not, examination of the subject rule for facial overbreadth would not be appropriate. As the *Bates* court noted, the overbreadth doctrine is " 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort.' " (*Id.,* at p. 381 [53 L.Ed.2d at p. 834], quoting from *Broadrick* v. *Oklahoma, supra,* 413 U.S. at p. 613 [37 L.Ed.2d at p. 841].) We decline to administer that medicine in the circumstances of this case.

We further note in connection with the foregoing that the Commission, at the close of the opinion portion of its decision, indicated its clear

_____

[9]The court stated: "The First Amendment overbreadth doctrine . . . represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. [Citations.] The reason for the special rule in First Amendment cases is apparent: An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. [Citation.] Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted. [¶] But the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged in [the *Virginia Pharmacy* case] there are 'commonsense differences' between commercial speech and other varieties. [Citation.] Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. [Citation.] Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service that he provides, and presumably he can determine more readily than others whether his speech is truthful and protected. *Ibid.* Since overbreadth has been described by this Court as 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort,' *Broadrick* v. *Oklahoma,* 413 U.S., at 613, we decline to apply it to professional advertising, a context where it is not necessary to further its intended objective. Cf. *Bigelow* v. *Virginia,* 421 U.S., at 817-818." (433 U.S. at pp. 380-381 [53 L.Ed.2d at pp. 833-834].)

intention to carefully monitor the operation of rule 31 and to limit its application if a proliferation of complaints should appear in the future.[10] In our view this is yet another consideration supporting our determination to exercise present restraint in undertaking an analysis of the rule for vagueness and overbreadth permitting applications detrimental to protected rights of free speech. (Cf. *Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547, 565-567 [56 L.Ed.2d 525, 541-543, 98 S.Ct. 1970, 1982].)

(d) *Due process.*

Petitioner contends that rule 31 is inconsistent with constitutional guarantees forbidding the taking of property without due process of law insofar as it permits the Commission to discontinue telephone service, albeit on a temporary basis,[11] without a prior hearing comporting with the procedural requirements required by such guarantees. ▉ Although we believe that certain aspects of the rule—notably those dealing with the breadth of the standard to be applied under the rule by the magistrate prior to the issuance of a finding of probable cause and the promptness with which hearings are to be conducted following summary initial termination—require revision in order to guard against future invasions of constitutional rights, we hold that petitioner has failed to demonstrate that the manner in which the provision was here applied operated to deprive him of any rights to which he was entitled under the state or federal due process clauses.

---

[10]The Commission stated: "Finally, it should be pointed out that complaints such as this have been infrequent. We hope that law enforcement agencies will use the applicable tariff rules dealing with termination of services in conjunction with criminal prosecutions. If there is a proliferation of complaints such as this resulting from service terminations, we may have to revise the applicable tariff rules in the context of an investigation. As a regulatory body we should not shoulder the responsibility to determine and squelch unlawful activity involving telephone use. The criminal court system exists to provide for resolution of alleged unlawful activity."

[11]As indicated above, the initial termination occurred on March 11, 1977, after General had been served with "Finding of Probable Cause" executed by Judge Waters. Service was temporarily restored on April 5, 1977, when the Commission, in light of petitioner's complaint and request for interim relief, granted such relief pending the holding of hearings on the complaint. The Commission's decision after hearing, pursuant to which service was permanently discontinued, was filed on July 26, 1977, and made immediately effective. Petitioner does not suggest that the form of notice and hearing accorded him prior to final termination of service was in any way inconsistent with due process, but he strenuously contends that any discontinuance of service prior to such notice and hearing was in derogation of his due process rights. The Commission concluded that any question of due process arising out of the temporary discontinuance of service was rendered moot by its granting of interim relief 25 days later, although it went on to discuss the matter on its merits. We do not agree. The fact that petitioner was deprived of service for 25 days prior to any hearing consistent with due process requirements clearly entitles him to raise the issue.

■ We have no doubt, and no contrary assertion appears, that the interest here in question—that of uninterrupted telephone service to one using such service for business purposes—is an interest in "property" of the nature entitled to protection against "taking" without due process of law. "In *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701], the United States Supreme Court observed that property interests safeguarded by procedural due process may take many forms. Explicating this concept, the court stated: 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . . He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.' ·(*Id.,* at pp. 576, 577 [33 L.Ed.2d at pp. 560, 561]; see also *Perry* v. *Sindermann* (1972) 408 U.S. 593, 601 [33 L.Ed.2d 570, 579-580, 92 S.Ct. 2694].)" (*Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 456-457 [121 Cal.Rptr. 585, 535 P.2d 713]; fn. omitted.)

A company providing telephone services to the public is a common carrier (Civ. Code, § 2168), and as such may not discontinue services without good cause. (*People* v. *Brophy* (1942) 49 Cal.App.2d 15, 33-34 [120 P.2d 946].) It follows from this, the United States Supreme Court has recently held, that a telephone subscriber asserting unlawful discontinuance of service thereby "assert[s] a 'legitimate claim of entitlement' [*Roth, supra,* 408 U.S. 564] within the protection of the Due Process Clause." (*Memphis Light, Gas & Water Div.* v. *Craft* (1978) 436 U.S. 1, 8-10 [56 L.Ed.2d 30, 38-39, 98 S.Ct. 1554, 1560-1561]; see also *Sokol* v. *Public Utilities Commission, supra,* 65 Cal.2d 247).

Given this, however, it remains to decide what process is "due" petitioner under the circumstances here before us.

■ "We start with the basic proposition that in every case involving a deprivation of property within the purview of the due process clause, the Constitution requires some form of notice and hearing. [Citations.] *Absent extraordinary circumstances justifying resort to summary procedures,* this hearing must take place *before* an individual is deprived of a significant property interest. [Citations.]" (*Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, 458; initial italics added.)

In the case of *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983], the United States Supreme Court outlined those kinds of circumstances which would be considered sufficiently "extraordinary" to justify the postponement of a hearing.[12] "Only in a few limited situations has this Court allowed outright seizure [see fn. 12, *ante*] without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food." (407 U.S. at pp. 90-92 [32 L.Ed.2d at pp. 576-577], fns. citing cases omitted.) (See also *Calero-Toledo* v. *Pearson Yacht Leasing Co.* (1974) 416 U.S. 663, 676-680 [40 L.Ed.2d 452, 464-466, 94 S.Ct. 2080]; *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 308 [138 Cal.Rptr. 53, 562 P.2d 1302].)

We believe that this is the standard to be applied to the circumstances here involved. Although the use of telephone facilities for illicit purposes is not in all respects comparable to, for instance, the use of a means of transportation for the carriage of illegal substances (e.g., *Calero-Toledo* v. *Pearson Yacht Leasing Co., supra,* 416 U.S. 663), we find the two situations to be sufficiently similar to justify the application of the same rule for determining whether postponement of hearing is justified in the circumstances.

Looking into the facts before us, we think it manifest that (1) initial termination without notice or hearing was "directly necessary" to the furtherance of an important public interest, and (2) that there was a demonstrable need for prompt and immediate action. The public interest involved, of course, was that of preventing the continued use of public utility facilities for the purpose of implementing the violation of criminal statutes affecting public welfare, health, and decency. Prompt and immediate action without prior notice or warning was required: absent such action, the subscriber might well have utilized the period between

---

[12]*Fuentes* involved the outright seizure of goods pursuant to a replevin statute. The court indicated, however, that similar considerations had been held to justify summary "takings" of less tangible "property" in other contexts. (407 U.S. at p. 91, fn. 23 [32 L.Ed.2d at p. 576].)

notification and actual termination to arrange for other service and inform established customers who called during the interim period of the changed number or numbers. (See *Sokol* v. *Public Utilities Commission, supra,* 65 Cal.2d 247, 254; Note, *Summary Termination of Telephone Service for Suspected Illegal Use* (1967) 20 Stan.L.Rev. 136, 143.)

It is the third requirement set forth in *Fuentes* (and applied in *Calero-Toledo*) which is of more serious concern to us. Can it be said, that the rule we here examine manifests "strict control" by the state over its "monopoly of legitimate force?" More particularly, can it be said that here "the person initiating the seizure has been a governmental official responsible for determining, *under the standards of a narrowly drawn statute,* that it was necessary and justified in the particular instance?" (*Fuentes, supra,* 407 U.S. at p. 91 [32 L.Ed.2d at p. 576].)

While we have no doubt that a magistrate who issues a "finding of probable cause" upon a showing by law enforcement officials is a "responsible governmental official" within the meaning of *Fuentes,* we are troubled by the fact that rule 31, in setting forth the standard to be applied by that official in making his or her determination, would seem to permit summary action in a broad range of circumstances unrelated to the basic concern of grave governmental necessity. Surely it cannot be said that the actual or threatened use of telephone facilities to violate or assist in the violation of *any* law would constitute the type of emergency situation justifying summary action. There is, in short, a great deal of difference from the point of view in need for immediate action between the use of telephones to plan, for example, a series of bombings and their use to plan a single petty theft—or indeed a breach of contract. Although we recognize that the rule has been uniformly interpreted to apply only in cases of actual or threatened *criminal* conduct, we believe that those portions thereof dealing with the use of summary discontinuance of service prior to hearing fail to comport with the requirements for summary "seizure" set forth in *Fuentes.* In order to so comport, the rule should provide at the least that in order to justify summary action the magistrate must find that there is probable cause to believe not only that the subject telephone facilities have been or are to be used in the commission or facilitation of illegal acts, but that the character of such acts is such that, absent immediate and summary action in the premises, significant dangers to public health, safety, or welfare will result.

We also note that rule 31, while it provides for a hearing (and the opportunity to apply for interim relief) before the Commission following summary discontinuance of service upon the filing of a complaint by the subscriber,[13] makes no explicit provision relative to the timing of that hearing.[14] We expressly indicated in our *Sokol* decision that a valid termination procedure must include a *prompt* opportunity for the subscriber "to challenge the allegations of the police and to secure restoration of the service." (65 Cal.2d at p. 256.) We reaffirm this requirement. Especially in circumstances involving business telephones, where discontinuance of service can have serious economic effects upon the subscriber—it is important the subscriber have an "early opportunity to put [concerned law enforcement agencies] to [their] proof." (*Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. 600, 609 [40 L.Ed.2d 406, 415].)

Accordingly we continue to be of the view that the rule, if it is to insure full compliance with applicable constitutional guarantees, must contain explicit provisions requiring an early hearing—especially in circumstances in which interim relief is requested.[15]

---

[13] We do not believe that the fact that a hearing is afforded only when the subscriber requests it by filing a complaint before the Commission renders the procedure constitutionally inadequate. The hearing is *mandatory,* not discretionary (see *Mitchell* v. *W. T. Grant Co.* (1974) 416 U.S. 600, 618 [40 L.Ed.2d 406, 419-420, 94 S.Ct. 1895]; cf. *Kash Enterprises, Inc.* v. *City of Los Angeles, supra,* 19 Cal.3d 294, 309; *Adams* v. *Department of Motor Vehicles* (1974) 11 Cal.3d 146, 156 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803]; see also *Garfinkle* v. *Superior Court* (1978) 21 Cal.3d 268, 276, fn. 13 [146 Cal.Rptr. 208, 578 P.2d 925]), and the rule places the burden of proof upon the concerned law enforcement authorities, not on the subscriber (see *Mitchell* v. *W. T. Grant Co., supra,* at p. 618 [40 L.Ed.2d at pp. 419-420]). The procedure in our view "effects a constitutional accommodation of the conflicting interests of the parties." (*Mitchell, supra,* at p. 607, see also p. 610 [40 L.Ed.2d at p. 413, see also 40 L.Ed.2d 415].)

[14] The rule does require immediate restoration of service within 15 days if the subscriber makes a written request therefor and the concerned law enforcement agency files no written objection. Upon the filing of such objection by the law enforcement agency, however, service may be restored only upon the filing of a formal complaint before the Commission by the subscriber. (See fn. 2, *ante.*)

[15] We also note that the rule here was interpreted by the Commission to permit its final order of termination to contain a provision that future business service was to be refused pending further order. (See text accompanying fn. 4, *ante.*) This interpretation was in our view correct, for any other interpretation would have the effect of rendering an order of the Commission refusing restoration of service wholly ineffective, in that it could be quickly avoided by the simple expedient of applying for new service. Moreover, we think that no infringement of constitutional rights results from the use of such a provision in a case which like this one involves purely commercial speech in the form of "business service." (Cf. *People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42 [130 Cal.Rptr. 328, 550 P.2d 600]; *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656 [97 Cal.Rptr. 320, 488 P.2d 648].) As the United States Supreme Court noted in the *Virginia Pharmacy* case, certain attributes of purely commercial speech "may . . . make inapplicable the prohibition against prior restraints. Compare *New York Times Co.* v. *United States,* 403 U.S. 713 (1971) [overturning injunction against publication of classified study concerning government decision-making on Viet Nam policy], with *Donaldson* v. *Read Magazine,* 333

■ We are not of the view, however, that the shortcomings adverted to above require us to grant present relief to petitioner. The affidavits before the magistrate which formed the basis of her issuance of the "Finding of Probable Cause" herein abundantly indicate the existence of a situation which, absent immediate and summary action, would result in the continued facilitation of criminal offenses posing significant dangers to public health, safety, and welfare. Moreover, the record indicates that petitioner was afforded a hearing before the Commission examiner beginning March 21, 1977, ten days after discontinuance of service and seven days following the filing of his complaint. Interim service was restored on April 5, and final termination did not occur until July 26, when the decision of the Commission issued. In these circumstances we are convinced that petitioner received all the process which the state and federal Constitutions established as his "due." No ground for relief here appears.[16]

(e) *Implied waiver of rights.*

It is urged that rule 31, by implying consent to its provisions as a consideration for furnishing service (see fn. 2, *ante,* par. 7), thereby involves an invalid waiver of constitutional rights. Petitioner cites no applicable authority in support of this proposition and we fail to perceive any merit in it. The rule requires consent to a procedure to be invoked in cases of unlawful use of telephone facilities. It does not, contrary to petitioner's contention, authorize the invasion of a subscriber's right to be free from unreasonable searches and seizures.

U.S. 178, 189-191 (1948) [upholding statutes permitting Postmaster General to return mail addressed to one found by him to be engaging in mail fraud]; *FTC* v. *Standard Education Society,* 302 U.S. 112 (1937) [misleading advertising]; *E. F. Drew & Co.* v. *FTC,* 235 F.2d, 735, 739-740 (CA2 1956), cert. denied, 352 U.S. 969 (1957) [same]." Where in circumstances such as here presented the Commission determines that its order should be given binding prospective effect, we think that that determination, and the provision adopted in order to effect it, should be upheld. We also believe, however, that the legitimate interests of the subscriber in obtaining service for legal purposes require that he be afforded a prompt opportunity to be heard and a prompt decision by the Commission when he applies for an order authorizing the granting of new service. The Commission has indicated through counsel at oral argument that such a procedure is to be adopted.

[16]Petitioner also urges that he and persons similarly situated were deprived of due process rights by the Commission's failure to hold public hearings in connection with the proceedings before it following *Sokol* which led to the adoption of rule 31. (See text accompanying fn. 1, *ante.*) It is clear however that the adoption of the subject rule involved the exercise of a legislative rather than a quasi-judicial function by the Commission and that public hearings were therefore not required. (See *Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823], and cases there cited.)

(f) *Consistency with Sokol requirements.*

It is argued that rule 31 does not comply with the requirements set forth in *Sokol* insofar as it fails to specify a pretermination procedure comprehending "the entire panoply of rights, rules and restrictions concerning the issuance of [search] warrants." Petitioner misreads our opinion in this respect. In indicating that the pretermination procedure should demonstrate "probable cause to act, in a manner *reasonably comparable* to a proceeding before a magistrate to obtain a search warrant" (65 Cal.2d at p. 256; italics added), we certainly did not suggest that the procedure must be in all respects *identical* to that involved in securing a search warrant. The fundamental requirements for the issuance of a search warrant are a showing of "probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched." (Pen. Code, § 1525.) ▮▮▮ Rule 31 provides for discontinuance of service only upon a "finding" of probable cause by a magistrate. We interpret this requirement as including a supporting showing by affidavit indicating the particular numbers to be affected and their location. As is apparent from the record in this case, the Commission has interpreted it in the same fashion. We find no variation from the requirements of *Sokol* in this respect.

V

We now turn to a group of contentions directed to the manner in which the provisions of rule 31 were applied in the context of the instant proceedings. The basic arguments presented are three in number: (1) that petitioner was improperly precluded from challenging the magistrate's finding of probable cause in the proceedings before the Commission; (2) that the Commission improperly considered evidence obtained by law enforcement officials by means of an invalid search warrant; and (3) that petitioner was denied his right to discovery.

(1) In both its interim and final decisions the Commission held that it was under no obligation to review the showing made before the magistrate in order to determine whether probable cause for summary termination existed. This was so, the Commission concluded, because petitioner's remedy in this respect lies in the criminal courts through a motion to suppress evidence under section 1538.5 of the Penal Code. In its answer to the petition for writ of review, however, the Commission appears to have abandoned this position, urging instead that whereas it

was empowered to rule on the issue of the adequacy of the showing made before the magistrate, its failure to do so resulted in no "fatal error" in the circumstances of this proceeding.

█ We believe that, as petitioner contends and as the Commission now appears to concede, the remedy set forth in section 1538.5 of the Penal Code is not applicable in the instant circumstances. That section may be invoked only by "a defendant" in a criminal case; petitioner, insofar as this proceeding is concerned, is not "a defendant." This does not mean, however, that as petitioner would appear to contend, that he is therefore entitled to invoke *before the Commission* the full range of procedures available to a "defendant" under section 1538.5 of the Penal Code (see, e.g., *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234]). In a civil administrative proceeding of this nature, where the liberty of the subscriber is not at stake, it is sufficient for purposes of the interim protection involved that the Commission limit itself to the face of the affidavits and an assessment of their adequacy to support the magistrate's finding.[17]

It should be noted in this respect that the above matter will normally arise in the context of an application by the subscriber for interim relief pending final determination of his complaint. If the Commission concludes that there is inadequate basis for the magistrate's finding, it should thereupon grant interim relief. Even in cases when it appears to the Commission that the finding is adequately supported by the affidavits presented to the magistrate, it may wish to consider the strength and character of the showing made as a factor to be weighed, along with pressing need or imminent economic damage, in its determination whether or not interim relief should be afforded to the subscriber.

We do not consider that the failure of the Commission in the instant case to undertake the indicated examination requires any present relief. Complete hearings have now been held and the decision rendered. For present purposes, therefore, the matter of support for the magistrate's finding must be considered moot.

█ (2) It is urged that the Commission was without legal authority to determine the validity of a search warrant pursuant to which certain

[17]For this reason we reject petitioner's contention that he should have been permitted to compel the attendance of the magistrate in order to give testimony relative to the ex parte probable cause hearing.

evidence presented was obtained. Again, we do not agree. Although the Commission is not required to undertake the kind of examination which would be necessary if the subscriber, as a "defendant" in a criminal case, would be entitled to invoke pursuant to a motion under section 1538.5 (cf. Pub. Util. Code, § 1701), we believe that its authority in cases of this nature includes the power to make an assessment of the affidavits presented in support of a search warrant pursuant to which evidence sought to be introduced before it was obtained, and to determine therefrom whether they contain a sufficiently objective and credible basis for the magistrate's finding. ██ In making this assessment, of course, the Commission should be cognizant of applicable constitutional safeguards,[18] but it should admit the subject evidence if it determines, disregarding those aspects of the affidavits which clearly fail to withstand constitutional scrutiny,[19] that a sufficient basis for admission exists. (Cf. *People* v. *Hill* (1974) 12 Cal.3d 731, 759 [117 Cal.Rptr. 393, 528 P.2d 1]; *Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 100-101, fn. 14 at p. 101.) We find no violation of this standard in the instant case.

---

[18]Article III, section 3.5 of the state Constitution, added thereto as a result of approval by the voters at the primary election held June 6, 1978, places certain restrictions on administrative agencies relative to their refusal to enforce *statutes* on constitutional grounds. It does not affect their enforcement of their own rules or their competence to examine evidence offered before them in light of constitutional standards.

[19]It is urged that certain matters related in the affidavits in support of the search warrant were the product of illegal entrapment, and that the Commission through its hearing examiner committed error when it, citing *Herrscher* v. *State Bar* (1935) 4 Cal.2d 399 [49 P.2d 832] and *Cooley* v. *State Bd. of Funeral Directors* (1956) 141 Cal.App.2d 293 [296 P.2d 588], took the position that such evidence could nevertheless be considered in the context of an administrative proceeding. We agree. An administrative agency, especially one of the stature of the Public Utilities Commission, must refuse to consider "evidence inconsistent with the dignity of its proceedings and the fair administration of justice." (*Patty* v. *Board of Medical Examiners* (1973) 9 Cal.3d 356, 364 [107 Cal.Rptr. 473, 508 P.2d 1121, 61 A.L.R.3d 342]; see also *Redner* v. *Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 83, 95 [95 Cal.Rptr. 447, 485 P.2d 799].) Just as evidence obtained by entrapment may not be considered "in administrative proceedings at which revocation or suspension of a license to practice a profession or business is at issue" (*Patty, supra,* at p. 367), we believe that such evidence should be excluded from consideration in a proceeding before the Commission which may result in the termination of business telephone service. As we noted in *Sokol,* "[i]n modern commercial society, telephone communication is indispensable to legitimate business operations, and the discontinuance of service for even a limited period of time is capable of causing a company to fail; . . . ." (65 Cal.2d 247, 254-255.) We believe that a proceeding which threatens such discontinuance must be conducted in a manner which refuses recognition to evidence obtained by the perfidious and deceitful means of entrapment.

None of the foregoing, however, requires relief on the part of this court in the instant case. Even if the subject material in the affidavit submitted in support of the search warrant was the product of entrapment—a point we do not decide—we conclude that there was ample untainted material in addition to it to support the issuance of the warrant.

(3) It is claimed by petitioner that he was improperly denied the opportunity to proceed with and perfect discovery. It appears, however, that ample time, including a continuance expressly for the purpose, was granted petitioner, and that in any event he failed to pursue his request.

## VI

Finally, we reject petitioner's contention that the Commission failed to make findings and conclusions on all issues necessary to its decision. (Pub. Util. Code, § 1705; see *Greyhound Lines, Inc.* v. *Public Utilities Com.* (1967) 65 Cal.2d 811 [56 Cal.Rptr. 484, 423 P.2d 556]. Although as we have indicated we do not agree with all of the determinations made by the Commission, we believe that its findings and conclusions adequately dispose of all issues raised by petitioner which were necessary and relevant to its decision.

## VII

For the foregoing reasons we have concluded that rule 31, while it must be modified in certain respects in order to insure the full future protection of constitutional rights to due process of law—and while it may bear further examination from the standpoint of overbreadth in some future case presenting a different factual situation—is generally consistent with the requirements of our *Sokol* decision and the requirements of applicable principles of state and federal constitutional law. We have also concluded that the application of the rule to petitioner in this case involved no violation of his legal or constitutional rights. As we have indicated, our scrutiny of rule 31 and its application in particular cases will not end with this decision, but for the present we are convinced that, subject to the observations we have made above, it "effects a constitutional accommodation of the conflicting interests of the parties." (*Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. 600, 607 [40 L.Ed.2d 406, 413].)

The order is affirmed.

Tobriner, J., Clark, J., and Richardson, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur with the majority in rejecting petitioner's challenges to the constitutionality of rule 31. I agree that the commission's decision to terminate petitioner's existing telephone service was correct. However, I cannot join that portion of the majority

opinion which finds the commission's order, directing General Telephone and Pacific Telephone and Telegraph to "refuse new business service to [petitioner] or any entity in which he has financial or managerial control, at any location in California, without further order of this Commission," to be proper. (Maj. opn., *ante*, pp. 665-666, fn. 15.) This order is consistent neither with the Constitution nor with the commission's own rules.

It is clear from the record that all the evidence before the magistrate and the commission pertained to petitioner's *prior* use of his telephone service. No evidence was presented that petitioner had applied for new business service or how he might use such service. Nevertheless, the commission concluded that there was a "reasonable probability" that restoration of telephone service would lead to a resumption of his illegal activity. The sole basis for the commission's conclusion was petitioner's belief that prostitution should be legalized.

On this record, the commission issued what amounts to a blanket prior refusal of business telephone service to petitioner. Since the record did not indicate the circumstances under which petitioner might seek telephone service in the future, the commission simply speculated as to the subject matter of his future conversations. Based on that speculation, the commission precluded petitioner from securing future service, which is available to everyone else for the asking.

This court has recognized that telephone service is "an essential means of communication" and that access to such service implicates the First Amendment. (*Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 255 [53 Cal.Rptr. 673, 418 P.2d 265].) In curtailing petitioner's future telephone service, the commission imposed a prior restraint on petitioner's ability to speak. It is indisputable that prior restraints on speech are "the least tolerable infringement on First Amendment rights." (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 559 [49 L.Ed.2d 683, 697, 96 S.Ct. 2791]; see *Near* v. *Minnesota* (1931) 283 U.S. 697, 712-714 [75 L.Ed. 1357, 1365-1367, 51 S.Ct. 625]; *New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [29 L.Ed.2d 822, 825, 91 S.Ct. 2140]; *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376, 390 [37 L.Ed.2d 669, 679-680, 93 S.Ct. 2553].) Since no extraordinary circumstance has been established here that would justify such a prior restraint, that part of the commission's order cannot stand. (Cf. *People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42, 58-59 [130

Cal.Rptr. 328, 550 P.2d 600]; *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 663-665 [97 Cal.Rptr. 320, 488 P.2d 648].)[1]

The impropriety of the commission's order is evident when the order is examined in light of the principles enunciated by the Supreme Court in *Pittsburgh Press.* That court upheld a local ruling which prohibited newspapers from publishing sex segregated "help-wanted" advertisements. However, the court was careful to state that nothing in its opinion should be construed to prohibit other advertisements, or criticisms or analyses of the ordinance or its enforcement. (*Id.,* at p. 391 [37 L.Ed.2d at p. 680].) Thus, the limitation on future expressions was carefully limited to clearly unlawful commercial speech. In contrast, based solely on petitioner's past conduct, the commission refused to allow petitioner any new business telephone service without its approval. It is as if the Supreme Court in *Pittsburgh Press* had forbidden the publication of any advertisement without prior government approval. Such a blanket prior restraint was not proposed because it is clearly incompatible with the protections afforded by the First Amendment.

However, the majority assert that no supervening First Amendment interest is involved because the commission's order affects only "purely commercial speech." (Maj. opn., *ante,* pp. 665-666, fn. 15.) The majority are sadly mistaken, for the commission's ban on future service is not carefully tailored to "speech which does 'no more than propose a commercial transaction,' [citation] . . . ." (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 762 [48 L.Ed.2d 346, 358, 96 S.Ct. 1817].) It prohibits *all* business telephone service, absent the commission's approval. The commission has thereby prevented petitioner from using this essential means of communication to facilitate clearly political expressions or wholly legitimate enterprises.

Ironically, the commission had a ready model for satisfying its concern that petitioner would use future telephone service to further illegal

---

[1]In *Busch,* an injunction was requested by law enforcement authorities to prohibit defendants from operating bookstores and movie theaters which had exhibited and sold obscene material. The court held that such action would constitute an unconstitutional prior restraint. "We are aware of no reported cases authorizing the closing of a bookstore or theater, even after it has been repeatedly determined judicially in a full adversary hearing that all or substantially all of the magazines or films exhibited or sold therein are obscene. . . . [W]e emphasize that the closing of such bookstores or theaters, either temporarily or permanently, or the enjoining of the exhibition or sale on said premises of magazines or films not specifically so determined to be obscene, constitutes an impermissible prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution." (*Busch, supra,* 17 Cal.3d at p. 59.)

activities. Rule 31 permits law enforcement authorities to seek to prevent new service from being extended to petitioner *if he applies for new service.* At that time, petitioner's intended use would be manifest. This procedure is identical to that established for the termination of existing service, requiring a probable cause hearing before a neutral magistrate and placing on law enforcement officials the burden of justifying a denial of service.[2] The rule, as modified by the majority opinion, also establishes the standards to be used by the commission in determining whether new service should be refused.

The commission eschewed this detailed procedure in favor of a more restrictive alternative, which lacks the safeguards found in rule 31. (Cf. *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5′ L.Ed.2d 231, 237, 81 S.Ct. 247].) The commission's order eliminates the burden on law enforcement authorities to establish before a neutral magistrate that "probable cause exists to believe that the use . . . to be made of the service is prohibited by law . . . ." Every use is presumptively tainted. Further, instead of requiring law enforcement authorities to justify interfering with petitioner's telephone service, the commission has saddled petitioner with the burden of applying to the commission to secure the means to communicate, and apparently the burden of convincing the commission of the legality of any proposed use.[3] This shift not only disregards the mandate in rule 31, but violates petitioner's right to due process of law. (See *Freedman* v. *Maryland* (1965) 380 U.S. 51, 58 [13 L.Ed.2d 649, 654, 85 S.Ct. 734].) Finally, the commission's order provides no standards for

[2]The pertinent part of rule 31 provides:

"1. Any communications utility operating under the jurisdiction of this Commission shall refuse service to a new applicant, and shall disconnect existing service to a subscriber, upon receipt from any authorized official of a law enforcement agency of a writing, signed by a magistrate, as defined by Penal Code Sections 807 and 808, finding that probable cause exists to believe that the use made or to be made of the service is prohibited by law, or that the service is being or is to be used as an instrumentality, directly or indirectly, to violate or to assist in the violation of the law.

". . . . . . . . . . . . . . . . . . .

"4. Any concerned law enforcement agency shall have the right to Commission notice of any hearing held by the Commission pursuant to paragraph 2 of this rule, and shall have the right to participate therein, including the right to present evidence and argument and to present and cross-examine witnesses. Such law enforcement agency shall be entitled to receive copies of all notices and orders issued in such proceeding and shall have both (1) the burden of proving that the use made or to be made of the service is prohibited by law, or that the service is being or is to be used as an instrumentality, directly or indirectly, to violate or to assist in the violation of the law, and (2) the burden of persuading the Commission that the service should be refused or should not be restored."

[3]The commission's decision provides that it will allow new service only "if we are convinced that [petitioner] is not resuming the use of telephone service to facilitate violation of the law." (Dec. No. 87642, p. 35.)

determining whether petitioner is entitled to receive new service. Such a standardless administrative procedure involving the exercise of First Amendment rights is impermissible. (See, e.g., *Perrine* v. *Municipal Court, supra,* 5 Cal.3d at pp. 661-662.)

For these reasons, I am compelled to conclude that the commission's order goes too far. Therefore, I would strike that portion of the order which directs the telephone companies to refuse future service to petitioner.

Mosk, J., and Newman, J., concurred.